## Owens-Corning Fiberglas Corporation

### v.

## Jacqueline R. Watson, Administratrix of the Estate of Wilbert G. Watson, Deceased

Record No. 910073

January 10, 1992

Present: All the Justices

John R. Easter (John M. Fitzpatrick; Mary Ann Link; Wright, Robinson, McCammon, Osthimer & Tatum, on briefs), for appellant.

Robert R. Hatten (Jonathan A. Smith-George; Donald N. Patten; Richard S. Glasser; Patten, Wornom & Watkins; Glasser and Glasser, on brief), for appellee.

JUSTICE HASSELL delivered the opinion of the Court.

This appeal presents questions concerning the admissibility of certain evidence, the refusal of certain jury instructions, and the sufficiency of the evidence to support a jury verdict which awarded a plaintiff compensatory and punitive damages against a manufacturer of an insulation product which contained asbestos.

## I. Proceedings

Wilbert G. Watson (Watson) filed a motion for judgment in the circuit court alleging negligence and breach of warranty against ten manufacturers and distributors of insulation products which contained asbestos, including Owens-Corning Fiberglas Corporation. Watson alleged that these defendants had failed to warn him of the dangers associated with the use of these products. Watson died before trial, and his widow, Jacqueline R. Watson, administratrix of his estate (administratrix), revived and amended the lawsuit as a wrongful death action.

All the defendants, except Owens-Corning, settled the administratrix's claims. The case proceeded to trial before a jury. The jury returned a verdict which awarded Watson's estate $900,000 in compensatory and $100,000 in punitive damages. The trial court deducted the settlement sums paid by other defendants and entered a final judgment against Owens-Corning for $409,017 in

compensatory and $100,000 in punitive damages, plus interest and costs. We granted Owens-Corning an appeal.[1]

## II. Facts

In accordance with well-settled principles, we will review the facts and all reasonable inferences they raise in favor of the administratrix, who comes to this Court with a favorable jury verdict, confirmed by the trial judge.

Owens-Illinois Glass Company originally developed and manufactured an insulation product known as Kaylo. Kaylo contained approximately 15% asbestos by weight.[2] It was made in two forms, flat blocks and pipe sections.

In 1953, Owens-Corning began to distribute Kaylo. Owens-Corning purchased the Kaylo manufacturing facility from Owens-Illinois in 1958. Owens-Corning's Kaylo products were used by employees at the Newport News Shipbuilding and Drydock Company in Newport News, Virginia.

Watson began working at the Newport News Shipbuilding and Drydock Company on May 25, 1964. During his first six months of employment there, he worked as a pipe coverer, spending the majority of his time insulating pipes and valves on the aircraft carrier America. He handled various insulation products containing asbestos, on a daily basis, insulating large pipes and valves in the reactor, engine, and boiler rooms.

John C. Scruggs, Jr. was a pipe coverer foreman on the America in 1964. He testified that Owens-Corning's Kaylo was the predominant type of asbestos block used on the America when Watson was working, and that 30 or 40 cartons of Kaylo were typically stored on the America's flight deck.

In November 1964, Watson changed jobs, and for the next 23 years he worked as a pipe fitter at the Newport News Shipbuilding and Drydock Company. As a pipe fitter, he installed and removed pipes aboard several submarines. He worked in the engine and reactor rooms in close proximity to pipe coverers, "about 100% of the time," when they cut and installed insulation prod-

---

[1] Counsel for Owens-Corning abandoned certain assignments of error before the bar of this Court, and accordingly, those assignments of error will not be considered.

[2] "Asbestos is the name given to a family of hydrated silicate minerals which occur naturally as masses of fibers with the unique properties of relative indestructibility and high resistance to fire." Note, *The causation problem in asbestos litigation: Is there an alternative theory of liability?* 15 Indiana Law Review 679 (1982).

ucts which contained asbestos. The cutting and installation of these products created dust in the confined areas where Watson worked.

David F. Peele, a pipe coverer who worked aboard the same submarines as Watson, testified that pipe coverers used asbestos block "mostly on a daily basis" during the construction and overhaul of these submarines. Kaylo comprised 45% of the asbestos block used to insulate steam generators, pressurizers, turbines, and other equipment on these submarines. Peele also testified that Kaylo block and pipe covering sections were routinely cut with hand saws, causing visible clouds of dust to accumulate in confined and poorly ventilated areas.

Watson died as a result of mesothelioma, which he contracted from inhaling asbestos fibers from insulation products, including Kaylo. Mesothelioma, a cancer of the lining of the lung, is not associated with smoking tobacco products.

## III.  Proposed Jury Instructions

In 1938, Dr. W.C. Dreessen, an employee of the United States Public Health Service, sought to determine a maximum safe level of exposure to dust which contained asbestos. Dreessen was unable to establish a definitive safe level of exposure because his study did not include a sufficient number of workers exposed to concentrations of asbestos dust for sufficient periods of time to enable him to evaluate the dangers of long-term exposure. Dreessen, however, selected a "tentative" danger level of exposure of five million particles per cubic foot of air sampled.

In 1946, the American Conference of Governmental and Industrial Hygienists published this tentative proposal as a threshold limit value for exposure to dust which contained asbestos. The Federal government adopted that standard in regulations promulgated under the Walsh Healey Act in 1960. *See* 41 U.S.C. §§ 35-45; 25 Fed. Reg. 13809.

Owens-Corning argues that during the trial it "presented overwhelming evidence of its compliance with industry and government standards regarding safe exposure levels to asbestos." Owens-Corning contends that the court erred by refusing to instruct the jury that Owens-Corning's purported compliance with these standards constituted strong and substantial evidence of due care and, at the very least, that the trial court should have in-

structed the jury that such compliance was evidence of Owens-Corning's due care and Kaylo's safety. We disagree.

■ The proposed jury instructions which Owens-Corning tendered to the trial court were improper. These instructions sought to have the court comment upon and emphasize certain evidence. We have consistently held that "an instruction is improper which singles out one portion of the evidence for special emphasis." *LeVasseur* v. *Commonwealth*, 225 Va. 564, 595, 304 S.E.2d 644, 661 (1983) (citations omitted); *see also Nelms* v. *Nelms*, 236 Va. 281, 286, 374 S.E.2d 4, 7 (1988).

### IV. The Saranac Documents and the Hemeon Report

In 1943, Owens-Illinois requested that the Saranac Laboratory conduct research on its Kaylo product. The Saranac Laboratory was considered the foremost research institute in the United States for the study of dust-related diseases. A series of unpublished studies issued by the Saranac Laboratory suggested that Kaylo may be hazardous. The final Saranac report on Kaylo and interim reports were admitted in evidence.

Mr. W.C.L. Hemeon, "head engineer" for the Industrial Hygiene Foundation, wrote a report in 1947. The report was written for the Asbestos Textile Institute, a private trade association. The report expressed concern about the safety of the five million particles per square cubic foot standard and questioned then-existing dust count methods. This report was admitted in evidence.

Owens-Corning argues that the trial court erred by admitting the Saranac documents and the Hemeon report in evidence because Watson failed to show that Owens-Corning received these documents, or that it knew, or should have known, about the documents.

■ A manufacturer is not an insurer of its product's safety, and a manufacturer has a duty to warn only if it knows or has reason to know that its product is dangerous. *Featherall* v. *Firestone*, 219 Va. 949, 962, 252 S.E.2d 358, 366 (1979). In *Featherall*, we adopted the test set forth in the *Restatement (Second) of Torts* when we stated:

> The manufacturer of a chattel will be subject to liability when he

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

*Id.* at 962, 252 S.E.2d at 366, (quoting *Restatement (Second) of Torts* § 388 (1965)).

There is a significant legal difference between the phrases *reason to know* and *should know*.

(1) The words "reason to know" are used throughout the Restatement [(Second) of Torts] . . . to denote the fact that the actor has information from which a person of reasonable intelligence or of the superior intelligence of the actor would infer that the fact in question exists, or that such person would govern his conduct upon the assumption that such fact exists.

(2) The words "should know" are used throughout the Restatement [(Second) of Torts] . . . to denote the fact that a person of reasonable prudence and intelligence or of the superior intelligence of the actor would ascertain the fact in question in the performance of his duty to another, or would govern his conduct upon the assumption that such fact exists.

*Restatement (Second) of Torts* § 12. The comment to § 12 states:

Both the expression "reason to know" and "should know" are used with respect to existent facts. These two phrases, however, differ in that "reason to know" implies no duty of knowledge on the part of the actor whereas "should know" implies that the actor owes another the duty of ascertaining the fact in question. "Reason to know" means that the actor has knowledge of facts from which a reasonable man of ordinary intelligence or one of the superior intelligence of the ac-

tor would either infer the existence of the fact in question or would regard its existence as so highly probable that his conduct would be predicated upon the assumption that the fact did exist. "Should know" indicates that the actor is under a duty to another to use reasonable diligence to ascertain the existence or non-existence of the fact in question and that he would ascertain the existence thereof in the proper performance of that duty.

*Id.* § 12, comment a.

■ As we said in *Featherall*, the appropriate standard in Virginia is whether a manufacturer has *a reason to know*, not whether the manufacturer *should know*. However, two instructions were read to the jury which imposed an inappropriate standard upon Owens-Corning. Without objection, these instructions became the law of this case. One instruction states, in part:

As an expert, a manufacturer is required to keep informed of the knowledge of experts in its field of manufacturing including scientific knowledge and discoveries made in that field.

The other instruction states, in part:

At the time of exposure to a product manufactured and/or sold by the defendant [Owens-Corning], that defendant knew, or through the exercise of reasonable care *should have known*, that exposure to asbestos dust from its products could cause injury to persons such as the Plaintiff's Decedent when the product was being used in a reasonably foreseeable manner; . . .

(Emphasis added).

■ These instructions imposed upon Owens-Corning a duty to ascertain and "keep informed" of scientific facts, including those facts contained in the Saranac documents and the Hemeon report. We hold that under these instructions, which we reiterate became the law of this case only, the trial court did not err when it admitted the Saranac documents and the Hemeon report.

## V. Summary of Workers' Compensation Claims

Owens-Corning argues that the trial court erred because it admitted in evidence a summary of other workers' compensation

claims without requiring a foundation of substantial similarity. This summary consisted of 44 workers' compensation claims filed by installers of insulation materials against Owens-Corning and its Fiberglas Engineering and Supply Company and included filing dates, claimants' names, diseases contracted, and the state where each claim was filed. The insulators who had filed those claims had cut and installed a variety of insulation products, including Kaylo, which contained asbestos.

■ We have held that:

> Evidence of other similar accidents or occurrences, when relevant, is admissible to show that the defendant had notice and actual knowledge of a defective condition; . . . [if the prior] occurrences happened . . . under substantially the same circumstances, and had been caused by the same or similar defects and dangers as those in issue . . .

*Spurlin, Administratrix* v. *Richardson*, 203 Va. 984, 989, 128 S.E.2d 273, 277 (1962) (citations omitted). *See also Ford Motor Co.* v. *Phelps*, 239 Va. 272, 276, 389 S.E.2d 454, 457 (1990); *General Motors Corp.* v. *Lupica*, 237 Va. 516, 521, 379 S.E.2d 311, 314 (1989). Additionally, "the test of admissibility is . . . *substantial similarity.*" *Roll 'R' Way Rinks* v. *Smith*, 218 Va. 321, 325, 237 S.E.2d 157, 160 (1977) (emphasis in original).

■ We hold that the summary of the workers' compensation claims is admissible. The summary shows that Owens-Corning had notice that insulators were at risk of contracting lung diseases from the use of insulation products which contained asbestos. The "substantial similarity" test is satisfied because Lewis Saxby, an Owens-Corning vice president, testified that the insulators claimed that they acquired lung diseases caused by exposure to asbestos dust while using insulation products.

## VI.   Conditions at Owens-Corning's Manufacturing Plant

Owens-Corning argues that the trial court erred by admitting in evidence several exhibits which tend to show Owens-Corning's knowledge of the health hazards of asbestos to its manufacturing plant employees. Owens-Corning contends that this evidence is not relevant and that Watson failed to establish that the conditions at the manufacturing plant, where raw asbestos fibers were used to

make Kaylo, were substantially similar to conditions in the ship-yard where Watson was exposed to Kaylo.

■ We have recently "defined as relevant 'every fact, however remote or insignificant, that tends to establish the probability or improbability of a fact in issue.' " *McMunn* v. *Tatum*, 237 Va. 558, 563, 379 S.E.2d 908, 910 (1989) (citation omitted). The determination of relevancy involves the exercise of the trial court's discretion. *Id.*

■ The documents are relevant because they indicate that Owens-Corning was aware of the dangers associated with inhaling asbestos fibers. Further, the exhibits show that Owens-Corning knew that, despite certain safeguards instituted in its manufacturing plant to reduce the amount of asbestos in the atmosphere, a significant number of its workers developed lung diseases. Additionally, Dr. Gerritt Schepers, an industrial hygienist and former director of the Saranac Laboratory, testified that the concentration of asbestos in the airborne dust in the manufacturing plant was substantially similar to the asbestos exposure associated with the normal use of Kaylo in shipyards. Accordingly, we hold that the trial court did not abuse its discretion in admitting these exhibits in evidence.

■ Owens-Corning argues, and we agree, that certain exhibits which show conditions at its manufacturing plant after the date of Watson's last exposure to Kaylo should not have been admitted in evidence. However, we have reviewed these exhibits, and we are convinced that had they been excluded from evidence, the jury would not have reached a different result. These exhibits are cumulative because they demonstrate Owens-Corning's knowledge of the dangers associated with inhaling asbestos fibers. Numerous exhibits, which were properly admitted in evidence, also proved Owens-Corning's knowledge of these hazards. We, therefore, hold that such error is harmless. *See Rhoades* v. *Painter*, 234 Va. 20, 24, 360 S.E.2d 174, 176 (1987) (judgment of trial court will be affirmed when the error complained of does not affect result); *see also White* v. *Lee*, 144 Va. 523, 531-32, 132 S.E. 307, 310 (1926).

### VII. Watson's Use of Tobacco Products

Owens-Corning sought to admit in evidence the fact that Watson's medical records indicate that he smoked three packs of cigarettes per day. At a pre-trial hearing, the administratrix moved to exclude any evidence of Watson's smoking habit because such evi-

dence might mislead the jury by creating an inference that smoking tobacco products may have caused or contributed to his mesothelioma, and that such evidence was not relevant. The trial court granted this motion.

Owens-Corning argues that the trial court erred because: smoking is a critical factor in asbestos cases involving issues about state-of-the-art evidence; Watson did not heed warnings on cigarette cartons and, thus, he would not have heeded warnings on Kaylo packages and; Watson's habit of smoking cigarettes affected his life expectancy.

There is no merit to Owens-Corning's argument that smoking is a critical factor in asbestos state-of-the-art evidence. Owens-Corning concedes in its brief that Watson died from mesothelioma, "a rare and fatal form of cancer that is not thought to be caused by smoking." The essence of Owens-Corning's state-of-the-art defense is not that cigarette smoking caused Watson's death, but that it had no reason to know that inhalation of asbestos fibers by insulation workers in shipyards would cause lung disease.

Evidence of Watson's conduct regarding warnings on cigarette cartons was properly excluded by the trial court. As the court observed, the fact that Watson disregarded warnings on cigarette packages, without more, is not probative of whether he would have heeded any warnings that may have been affixed to asbestos product packages.

Next, Owens-Corning argues that the trial court erred by excluding evidence that Watson smoked because the administratrix introduced in evidence the table of life expectancy contained in Code § 8.01-419 and, thus, Owens-Corning was unable to show that Watson's smoking history had reduced his life expectancy from 30.9 years as indicated on the actuarial table.[3] Contrary to its assertions, Owens-Corning was not denied the opportunity to make such a showing.

Dr. Marie Cui, Watson's physician, was instructed by the court, out of the presence of the jury, that when Owens-Corning's

---

[3] Code § 8.01-419 states, in part:

Whenever, in any case not otherwise specifically provided for, it is necessary to establish the expectancy of continued life of any person from any period of such person's life, whether he be living at the time or not, the following table shall be received in all courts and by all persons having power to determine litigation as evidence, with other evidence as to the health, constitution and habits of such person, of such expectancy represented by the figures in the following columns: . . .

counsel asked her about what habits, if any, may have reduced Watson's life expectancy, she was to answer that question by taking into consideration Watson's weight, smoking habits, or anything else that she may have known about his health or habits. The following testimony was given in response to a question asked by counsel for Owens-Corning:

Question: [B]ased on all of the conditions we've described before, and [Watson's] general health, constitution and habits, do you have an opinion to a reasonable degree of medical certainty whether in fact [he] had a significantly reduced life expectancy independent of his mesothelioma?

Answer: He would — with a reasonable degree of medical certainty, he would have a reduced life expectancy, but not in the 40s.

Counsel for Owens-Corning, for whatever reason, chose not to ask Dr. Cui the specific number of years that Watson's habits reduced his life expectancy. Accordingly, we hold that the trial court did not abuse its discretion in excluding evidence of Watson's history of smoking tobacco products.

## VIII. The Konzen Memorandum

Owens-Corning argues that the trial court erred because it admitted in evidence a memorandum that Dr. John Konzen, Owens-Corning's medical director, wrote and forwarded to Owens-Corning's in-house counsel.

In December 1968, Claude J. Tomplait filed a lawsuit against Owens-Corning in a federal court in Texas. He alleged that he contracted asbestosis as a result of exposure to Kaylo when he was an insulator. Dr. Konzen was asked by in-house counsel to comment on Tomplait's condition and certain interrogatories propounded to Owens-Corning. One of the interrogatories asked whether Owens-Corning recognized that prolonged use of its insulation materials could "cause or contribute to cause" various occupational diseases including asbestosis.

In a memorandum dated February 9, 1968, written to in-house counsel, Konzen stated:

The point of these questions appears to be to establish that asbestosis was a well known entity to industrial medical practice over the entire period that Mr. Tomplait handled asbestos containing insulation. The answer to the three questions can be summed up by saying that the condition was well known and well documented in the literature during the entire time that Mr. Tomplait used the insulation.

Five days later, Owens-Corning stated in response to the interrogatory: "Owens-Corning does not recognize that the result expressed in this question could occur and specifically denies that such could occur." Tomplait then propounded another interrogatory to Owens-Corning requesting that it explain the basis of its previous answer. Owens-Corning stated, in part, that it "has no information or belief that prolonged use of its products containing asbestos fibers will cause 'asbestosis.' "

The trial court held that the Konzen memorandum was not protected by the attorney-client privilege because Owens-Corning had committed an act of fraud upon the Texas court by answering interrogatories in a manner inconsistent with the information contained in Konzen's memorandum. The court found that Owens-Corning had in its possession information that prolonged use of its insulation products could cause certain occupational diseases and that it had knowingly answered the interrogatory falsely.

■ Confidential communications between attorney and client made during the course of the relationship and that relate to the subject matter of the attorney's employment are privileged from disclosure. *Commonwealth* v. *Edwards*, 235 Va. 499, 508-09, 370 S.E.2d 296, 301 (1988). This privilege exists between a corporation and its in-house attorney. *See Upjohn Co.* v. *United States*, 449 U.S. 383, 389-90 (1981). However, the privilege does not permit a litigant to commit a fraud upon a court. *See Seventh District Committee* v. *Gunter*, 212 Va. 278, 287, 183 S.E.2d 713, 719 (1971).

Thus, we must consider whether the trial court correctly concluded that a fraud was committed upon the federal court in Texas. In *Hazel-Atlas Glass Company* v. *Hartford-Empire Company*, 322 U.S. 238 (1944), the United States Supreme Court vacated a prior judgment in favor of a patent holder because his attorneys wrote an article that was published in a trade journal, which was used to bolster a patent application which had not been

received favorably by the United States Patent Office. The article was purportedly written by a "disinterested expert" and heralded the process sought to be patented. Ultimately, the patent was issued and the patent holder filed and won a suit for patent infringement. Several years later, the unsuccessful litigant learned that the patent holder's attorneys were the actual authors of the trade journal. The Supreme Court, vacating the prior judgment, stated:

> [T]ampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society.

*Id.* at 246.

Few courts have discussed the factors that must be proven when deciding whether a fraud has been committed upon a court. However, a controlling factor is "whether the misconduct tampers with the judicial machinery and subverts the integrity of the court itself." *United Business Communications, Inc.* v. *Racal-Milgo, Inc.*, 591 F.Supp. 1172, 1186 (D.Kan. 1984).

We hold that, under the facts and circumstances of this case, the trial court did not err in holding that the attorney-client privilege did not extend to the Konzen memorandum because Owens-Corning committed a fraud upon the Texas court. Owens-Corning's in-house counsel received the Konzen memorandum on February 9, 1968. Yet, five days later, Owens-Corning filed an answer to an interrogatory under oath. The answer contained a statement which Owens-Corning knew was patently false. This false statement, under oath, constituted a fraud upon the Texas court and, thus, the Konzen memorandum which reveals this fraud is not protected by the attorney-client privilege. *See Smith* v. *Cessna Aircraft Co.*, 124 F.R.D. 103 (D.Md. 1989) (litigant committed fraud upon court by knowingly filing false answers to interrogatories). Exclusion of the Konzen memorandum from evidence would merely perpetuate the original fraud upon the Texas court and would not serve to promote the administration of justice in Virginia's courts.

IX.   Sufficiency of the Evidence

Owens-Corning argues that the administratrix failed to establish that Watson was exposed to asbestos fibers from Kaylo and that his death resulted from such exposure.

A plaintiff may prove exposure to a particular manufacturer's product through circumstantial evidence. As we have stated:

> Although the fact-finder is not authorized to indulge in speculation or guesswork, this does not destroy the weight of circumstantial evidence in fixing civil liability. 'Proof of facts from which it can be reasonably inferred that an act or circumstance sought to be established occurred or existed is sufficient to authorize submission of the issue to the jury.' But such circumstantial evidence must be sufficient to establish that the result alleged is a probability rather than a mere possibility.

*Southern States Coop.* v. *Doggett*, 223 Va. 650, 657, 292 S.E.2d 331, 335 (1982) (citations omitted). We have repeatedly emphasized that "[w]hen a verdict is based on circumstantial evidence, 'all that is required is that a jury be satisfied with proof which leads to a conclusion with probable certainty where absolute logical certainty is impossible.' " *Chase* v. *Breit*, 226 Va. 102, 104, 306 S.E.2d 877, 878 (1983) (quoting *Bly* v. *Southern Ry. Co.*, 183 Va. 162, 176, 31 S.E.2d 564, 570 (1944)). *See Fobbs* v. *Webb Building Ltd. Partnership*, 232 Va. 227, 230, 349 S.E.2d 355, 357 (1986); *Richardson* v. *Lovvorn*, 199 Va. 688, 692, 101 S.E.2d 511, 514 (1958). Thus, we must consider whether the administratrix produced evidence which leads to a conclusion with probable certainty that Watson contracted mesothelioma as a result of exposure to Kaylo.

The administratrix's medical witnesses testified that Watson's death was caused by mesothelioma attributed to multiple exposures to asbestos. Additionally, the medical evidence revealed that very limited exposure to asbestos fibers can cause mesothelioma. Owens-Corning admitted that it sold Kaylo to the Newport News Shipyard when Watson was employed there. Watson testified in a pre-trial deposition that, as a pipe coverer, he handled and cut asbestos blocks in the engine rooms, boiler rooms, and other areas

of the America. When Watson cut these blocks with a hand saw, visible dust was created.

Scruggs testified that Kaylo was the predominant type of asbestos block used on the America. When Kaylo was cut, dust was created and there was very little ventilation to reduce the dust level.

Therefore, we hold that the evidence, though circumstantial, was sufficient to support the jury's finding that Watson was exposed to Kaylo and that such exposure was a proximate cause of his death.

## X. Punitive Damages

Owens-Corning argues that the evidence is insufficient to support the jury award of punitive damages.

The imposition of punitive damages is not favored generally and, "[b]ecause punitive damages are in the nature of a penalty, they should be awarded only in cases of the most egregious conduct." *Philip Morris Incorporated* v. *Emerson*, 235 Va. 380, 407, 368 S.E.2d 268, 283 (1988).

We have stated "that negligence which is so willful or wanton as to evince a conscious disregard of the rights of others, as well as malicious conduct, will support an award of punitive damages . . ." *Booth* v. *Robertson*, 236 Va. 269, 273, 374 S.E.2d 1, 3 (1988). Willful and wanton negligence is defined as "acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another." *Griffin* v. *Shively*, 227 Va. 317, 321, 315 S.E.2d 210, 213 (1984) (citation omitted); *see also Infant C.* v. *Boy Scouts of America, Inc.*, 239 Va. 572, 581-83, 391 S.E.2d 322, 327-28 (1990).

We recently considered whether evidence was sufficient to support a jury award of punitive damages in *Emerson*. There, Texaco conducted experiments on rocket fuels and filaments, using a liquid known as pentaborane, in a laboratory facility it owned in Richmond. Pentaborane is highly toxic to humans and is 2,000 times more deadly than hydrogen cyanide, the gas commonly used for execution in gas chambers. It is highly reactive to oxygen and will ignite when it reaches a concentration of 2% in the air. 235 Va. at 388, 368 S.E.2d at 271.

Texaco buried 19 cylinders, including at least three small pressurized cylinders which contained pentaborane, in a pit near its Richmond laboratory buildings. In 1978, Texaco sold its Richmond facility to Philip Morris, but failed to disclose to Philip Morris that it had buried the chemicals. Later, Texaco advised Philip Morris of the chemical burials, but did not reveal the contents of the cylinders. *Id.* at 388, 368 S.E.2d at 272.

When Philip Morris began constructing another building on the property, its contractors uncovered chemical waste, including the 19 cylinders. The cylinders were removed from the burial pits and taken to the laboratories of Environmental Laboratories, Inc. Many of the cylinders had corroded and 13 cylinders contained no labels identifying their contents. The remaining six were marked with chemical formulas which identified their contents. *Id.* at 388-89, 368 S.E.2d at 272.

Philip Morris contacted Texaco for assistance in identifying and disposing of the cylinders. Texaco researched its files, gave Philip Morris the minimal information it found, and refused to be of further assistance unless Philip Morris would execute a hold harmless agreement. Philip Morris refused to execute such an agreement. Texaco did nothing to assist in identifying or disposing of the chemicals. It did not notify Philip Morris or any of its contractors that any cylinder contained pentaborane. *Id.* at 389, 368 S.E.2d at 272.

Philip Morris made numerous attempts to retain a contractor to dispose of the cylinders and eventually retained A-Line Industries to do so. James Kachur, one of the two owners of A-Line, drained an unknown chemical from a pressurized chamber into an open breaker and carried the breaker into Environmental Laboratories' office. The fumes emitted by the pentaborane killed Kachur and injured several others, including rescue workers.

We held that the evidence was sufficient to prove something more than ordinary negligence and perhaps even gross negligence on the part of Texaco and Philip Morris, but that the evidence did not show that their acts and omissions constituted willful and wanton negligence. *Id.* at 409, 368 S.E.2d at 284. However, we did affirm a jury award of punitive damages against A-Line because the evidence showed that Kachur knew he was hired to dispose of dangerous chemicals, he knew that at least two of the cylinders contained pentaborane, and he should have treated all the remaining unmarked cylinders as though they con-

tained equally dangerous chemicals. Kachur also knew that oxygen masks were essential for protection, yet he deliberately exposed himself and others to a chemical which was emitting an odor and obviously reacting in some fashion with the outside air. *Id.*

■ Likewise, we hold that Watson's administratrix presented sufficient evidence to support the jury's award of punitive damages because Owens-Corning, just as Kachur, committed certain positive acts which the jury could have concluded constituted willful or wanton conduct evincing a conscious disregard of the rights of others.

■ The evidence shows that since 1942, long before Watson handled Kaylo, Harold Boeschenstein, the president of Owens-Corning during the time period relevant to this case, knew the health hazards associated with the inhalation of asbestos fibers; that he embarked upon a strategy to use this information to benefit Owens-Corning during negotiations with its labor unions; and that, when necessary, he concealed this information to promote the sales of the Kaylo product.

Boeschenstein received a memorandum dated January 7, 1942, which reviewed Owens-Corning's labor strategies with the Asbestos Workers Union in 1941 and its proposed strategies for 1942. The memorandum suggested a plan of action which included the following:

> Gather as a weapon-in-reserve an impressive file of photostats of medical literature on asbestosis. Available are two bibliographies covering medical literature to 1938, citing references to scores of publications in which the lung and skin hazards of asbestos are discussed. This file would cover five or six hundred pages, which can be microphotographed in the library of the Surgeon General in Washington or in some other medical library.

The memorandum proposed several courses of action designed to obtain the union's cooperation. After reviewing these options, the memorandum states:

> If [the union's] reaction is unfavorable, the way is opened to spread word among the locals about the refusal of the Union officials to make [insurance protection and industrial hygiene precautions] available to the [union] members and

play all the stops on asbestosis. Implied is the threat to distribute to all members of the union copies of the U.S. Public Health Bulletin # 241, on Asbestosis.[4]

Edward Ames, Owens-Corning's public relations director and assistant to Boeschenstein, testified that Owens-Corning was concerned because the Asbestos Workers Union members tried to compel Owens-Corning to pay its members a premium when handling fiberglas materials. At that time, the union members were also handling materials which contained asbestos. Therefore, Owens-Corning, along with a doctor "of great renown and integrity," made a thorough and complete investigation to ascertain the hazards associated with exposure to fiberglas materials. While undertaking this research, Owens-Corning learned that exposure to asbestos fibers over a long period of time could cause asbestosis. Owens-Corning, in its effort to prevent the union members from extracting a premium from it to handle fiberglas materials, tried to prove that exposure to fiberglas materials did not involve any hazard, whereas exposure to asbestos may cause lung disease. As Ames stated "we were trying to disprove something that didn't need to be disproved." Boeschenstein was aware of this strategy.

In 1943, Ames wrote a memorandum which discussed the hazards of exposure to asbestos and Owens-Corning's concerns that it not *"run the risk of smearing fiberglas with the hazards of exposure to asbestos."* (Emphasis in original).

In 1956, Dr. Schepers stated in a letter to M.D. Burch, Owens-Corning's director of personnel and industrial relations, "I suppose you already know that asbestos is fairly well incriminated as a carcinogen and the asbestos causes lung damage by virtue of the length of its fibers, a property it shares with fiberglas." That same year, Schepers met with twenty-two Owens-Corning senior executives and explained to them the adverse effects of inhalation of asbestos.

Even though Owens-Corning advised its own insulators to maintain good housekeeping on projects and to use respirators when there were substantial levels of dust in the air, it did not warn insulators, such as Watson, who were employed by purchasers of Kaylo products. Rather, beginning in 1957, Owens-Corning concealed the dangers of inhalation of Kaylo dust by publishing

---

[4] This bulletin, also known as the Dreessen report, discussed health hazards in the asbestos industry.

sales brochures which described Kaylo as having "pleasant handling characteristics" and being "non-toxic."

In 1963, William A. Lotz, who was in charge of Owens-Corning's product development, acknowledged that "[a]sbestos (as found in Kaylo) when breathed into the lungs causes asbestosis which often leads to cancer." In 1964, the same year Watson started handling Kaylo, Owens-Corning obtained copies of Dr. Irving J. Selikoff's published epidemiologic study of 1,000 insulators. Selikoff was a physician with the Mt. Sinai School of Medicine. His report identified a high incidence of cancer among insulation workers who handled asbestos products. In November 1965, F.H. Edwards, an Owens-Corning employee, was concerned because Dr. Selikoff delivered a paper which discussed a study he had performed which showed a higher rate of death from cancer of the lungs, stomach, colon, and rectum among insulators. Edwards sent a memorandum to several Owens-Corning executives which stated:

> The [attached] report describes what little information we have about Dr. Selikoff . . .
>
> Our present concern is to find some way of preventing Dr. Selikoff from creating problems and affecting sales. A direct approach might be more damaging than helpful and I am only suggesting that we explore, at this time, all avenues open to us.

The jury may have concluded upon considering this evidence that Owens-Corning knew that inhalation of dust from its Kaylo product could cause lung disease in humans, that it actively concealed this danger, and it did not warn insulators of this hazard even though it warned its own employees. Accordingly, we hold the evidence is sufficient to support the jury's award of punitive damages.

## XI.

For the foregoing reasons, we will affirm the judgment of the trial court.

*Affirmed.*