**AMERICAN SALES CORPORATION,**
Plaintiff,

v.

**ADVENTURE TRAVEL, INC. and
John K. Bowers, Defendants.**

**Civ. A. No. 2:93cv782.**

United States District Court,
E.D. Virginia,
Norfolk Division.

Sept. 8, 1994.

Dean T. Buckius, Neil S. Lowenstein, Vandeventer, Black, Meredith & Martin, Norfolk, VA, for plaintiff.

Gregory K. Pugh, Stallings & Richardson, P.C., Virginia Beach, VA, for defendant.

## OPINION AND ORDER

PRINCE, United States Magistrate Judge.

Before reaching the merits of the case, the Court must address the claims against the second named defendant, John K. Bowers. Plaintiff filed the Complaint (Docket Entry No. 1) on July 28, 1993, naming both Adventure Travel, Inc. and John K. Bowers defendants, and alleging misappropriation of trade secrets in Count I, conspiracy to injure plaintiff's business in Count II, and breach of contract in Count III. Defendants filed a joint Answer (Docket Entry No. 16) on September 9, 1993, and a joint Amended Answer (Docket Entry No. 19) on October 4, 1993.

Several motions involving defendant Bowers followed, including plaintiff's Motion for Partial Summary Judgment as against Bowers on Counts I and III (Docket Entry No. 40) and Bowers' Motion for Partial Summary on Count III (Docket Entry No. 47). The Court held a hearing on these motions on March 8, 1994, and took the matters under consideration. The Court entered an Order (Docket Entry No. 53) on March 16, 1994 denying plaintiff's motion, but granting Bowers', thereby ending the breach of contract claim against him. Counts I and II survived.

The Court held the final pretrial conference on March 18, 1994, and entered the Order (Docket Entry No. 60) on April 6, 1994. In the "Triable Issues" section, the Order stated that "[t]he plaintiff has agreed to voluntarily dismiss Count 1, Uniform Trade Secrets Act against John K. Bowers, individually, and has agreed to voluntarily dismiss Count 2, Conspiracy, against both defendants." Based upon this, the Court ORDERS plaintiff's remaining claims against John K. Bowers, Counts I and II, DISMISSED WITH PREJUDICE pursuant to Fed.R.Civ.P. 41(a)(2), thereby eliminating John K. Bowers as a defendant in his individual capacity.

## A. Procedural History

Plaintiff's Complaint against Adventure Travel, Inc. ["defendant"], and the Answer and amendments by defendant were filed as noted above. Plaintiff filed a Motion for Summary Judgment (Docket Entry No. 40) against defendant on February 14, 1994, defendant responded on March 2, 1994 (Docket Entry No. 48), and the Court held a hearing on March 8, 1994. On March 16, 1994, the Court granted plaintiff's Motion for Summary Judgment (Docket Entry No. 53) on Counts I and III. In the Order on the Final Pretrial Conference (Docket Entry No. 60), the parties acknowledged that the entry of summary judgment resolved the issue of liability against defendant for misappropriation of trade secrets and breach of contract. The only remaining issue for trial was the amount of damages to award plaintiff. This matter came on for trial on April 6, 1994. On March 8, 1994, the parties consented to have a Magistrate Judge conduct all proceedings in the case, including the trial, and order the entry of final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.

## B. Findings of Fact

The Court, having heard and considered all of the evidence, FINDS the following facts:

1. Plaintiff is a multi-level marketing company originally doing business under the name of American Benefits Plus ["ABP"], which was recently changed to KaloVita. It is a company that sells a collection of discount services for a fee called a "Passport" membership—travel, shopping, pharmacy, etc.—through independent distributors. These distributors purchase one or more Passport memberships, resell them to others, and recruit and train many of these other people to become distributors themselves. These recruits become that distributor's "downline."

2. Until February of 1993, defendant, Adventure Travel, Inc. ["AT"], provided discount travel for Passport members under a contract, but after the termination of the contract created its own multi-level marketing company offering discount services very similar to plaintiff's under the name of Global Value Network ["GVN"]. This was in re-

sponse to a possible venture with an investor from Greece.

3. At the heart of this dispute is a list, which plaintiff compiled, containing the names, addresses, and phone numbers of all 28,000 Passport members. Plaintiff obtained many of the names on that list from a list of Pat Robertson and Christian Broadcasting Network supporters, and did not actually go to the expense of compiling every name itself. Members would often purchase many Passport memberships at one time, indicating that the 28,000 member list overstates the actual number of members—"front-loading." Plaintiff provided defendant with this list, updated daily, but in the contract stressed the importance of keeping the list confidential and prohibited defendant from using the list for its own gain. The multilevel marketing industry is highly competitive, and these types of lists are expensive to develop and compile, thereby making it very important to keep them confidential. Lists like these are "invaluable" in this industry.

4. Around April of 1993, after the contractual relationship between the parties had ended, plaintiff's president learned that representatives of GVN had been soliciting Passport members directly to join their company with phone calls, a brochure, and a video tape. This video tape was previously labelled with plaintiff's name.

5. Defendant contacted between thirty-five and fifty Passport members from that list, all of whom John Bowers, defendant's president, considered strong potential customers because they had used defendant's product before. Defendant successfully convinced seven of them to join GVN; the value of those seven memberships was $1,178.00.

6. GVN representatives made certain disparaging remarks about plaintiff's service and integrity during their solicitation, and plaintiff's president received numerous calls from its members expressing concern about this.

7. Terry Thrasher, a Passport member, talked directly with John Bowers. During that conversation, Mr. Bowers expressed his severe dissatisfaction with the integrity of plaintiff and its owners, and claimed that he wished to "destroy" plaintiff's business. He was "upset," as he stated, and only expressing his anger at Pat Robertson [1] and how the two parties' dealings had progressed. He did not attempt to solicit Mr. Thrasher during that conversation. He had been frustrated by failure in his numerous attempts to contact Pat Robertson and work out their differences. He did not, in fact, want to ruin plaintiff's business.

8. John Keller, plaintiff's current president, had no personal knowledge of a request made by plaintiff's attorneys to return the list after the contract termination, and made no direct request himself. John Bowers never received any request.

As stated above, plaintiff's liability for using the list was settled through summary judgment, and the parties presented the issue of damages at trial. The Court FINDS as follows with regards to damages:

9. The market value of a list with this type of information is approximately $150 per 1,000 names per use. This price is the result of the costs of compiling and maintaining the list. The fact that some names on it are obsolete would not affect its value. A buyer would not have to purchase the entire 28,000 names for each use, but would be required to buy at least 3,000 to 5,000.

10. All of plaintiff's advertising and promotional costs went to building this list. In 1991, plaintiff spent $33,000 on advertising and $88,000 on promotions; in 1992, plaintiff spent $99,000 on advertising and $65,000 on promotions. Plaintiff's average profit margin is 36% on these memberships.

11. The wage costs for processing a Passport application and adding a name to the list is $0.725 per application, based on hourly wages and benefits.

12. On January 31, 1993, there were 27,798 Passport members; at the time of trial there were 5,700.

---

**1.** Pat Robertson was at one time involved with ABP, but is no longer due to negative publicity about plaintiff's association with his Christian Broadcasting Network.

### C. Conclusions of Law

Initially, the Court recognizes that plaintiff seeks recovery based on alternative theories—misappropriation of trade secrets and breach of contract. As plaintiff admits, it is not entitled to double recovery. Plaintiff also cites numerous sources supporting the proposition that "[r]ecoverable damages for misappropriation of trade secrets under the Uniform Trade Secrets Act and by breach of a confidentiality provision of a contract are the same." The Virginia Uniform Trade Secrets Act ["the Act"], Va.Code Ann. § 59.1–338 (Michie 1992), sets out in specific language how damages are to be calculated in these cases, and there is sufficient case law for guidance. Because damages can be set adequately under the trade secrets theory, and in light of plaintiff acknowledging that the calculations would be the same anyway, the Court need not address plaintiff's arguments under breach of contract. *See, e.g., Structural Dynamics Research Corp. v. Engineering Mechanics Research Corp.*, 401 F.Supp. 1102, 1119–20 (E.D.Mich.1975) (using the trade secret factors to compute damages for breach of contract).

### 1. Compensatory Damages

Computing damages in a trade secrets case is not cut and dry. Before Virginia enacted the Uniform Trade Secrets Act, courts set damages at the loss suffered by the plaintiff *or* the defendant's unjust enrichment, but would not hear proof of both. *See, e.g., Sperry Rand Corp. v. A–T–O, Inc.*, 447 F.2d 1387 (4th Cir.1971), *cert. denied*, 405 U.S. 1017, 92 S.Ct. 1292, 31 L.Ed.2d 479 (1972). The Act explicitly changed that, and set the computation of damages as follows:

> Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. If a complainant is unable to prove a greater amount of damages by other methods of measurement, the damages caused by misappropriation can be measured exclusively by imposition of liability for a reasonable royalty for a misap-

propriator's unauthorized disclosure or use of a trade secret.

Va.Code Ann. § 59.1–338 (Michie 1992).

There are few Virginia or Fourth Circuit cases involving the Act, but *University Computing Co. v. Lykes–Youngstown Corp.*, 504 F.2d 518 (5th Cir.1974), is especially helpful with damages in determining when to consider certain factors and in defining what a "reasonable royalty" is. There the court analogized these cases to the determination of damages in patent infringement cases, where there is much more precedent. *Id.* at 535 (citation omitted). Although that court discussed in detail the computation of damages under many different approaches, it stressed that " 'each case is controlled by its own peculiar facts and circumstances,' " *id.* at 538 (quoting *Enterprise Manufacturing Co. v. Shakespeare Co.*, 141 F.2d 916, 920 (6th Cir.1944)), and that courts should remain "flexible and imaginative," *University Computing*, 504 F.2d at 538.

Under the Act, this Court will calculate a "reasonable royalty" as plaintiff's award. The Act dictates that plaintiff's loss plus defendant's unjust enrichment is the appropriate measure unless it would provide an inadequate sum; otherwise it should be a "reasonable royalty" exclusively. The situation where plaintiff's loss would be the most useful measure is where defendant disclosed or published plaintiff's secret and seriously injured its business, as the court in *University Computing* noted. That is not the case here. As for unjust enrichment, the only evidence at trial was the list of seven ABP members who had actually responded to GVN's solicitation by converting their membership. The total value of their purchase from GVN was $1,178.00, but there was no evidence as to what amount of that was profit, which would be the real measure of defendant's unjust enrichment. At any rate, an amount of less than $1,000 would hardly compensate plaintiff for the misappropriation of trade secrets that an expert in the multilevel marketing business described as "invaluable." "The lack of [significant] profits does not insulate the defendant[ ] from being obliged to pay for what [it has] wrongfully obtained in the mistaken belief [its] theft

would benefit [it]." *Id.* at 536. This Court therefore will quantify a "reasonable royalty" as plaintiff's exclusive remedy.

■ The court in *University Computing* considered numerous factors in arriving at a "reasonable royalty" in that case. Overall, though, it focused on the "approximation of the actual value of the infringed [secret] to the defendant," *id.* at 537, relying on " 'the fiction that a license was to be granted at the time of beginning the infringement, and then ... determin[ing] what the license price should have been ... if both [parties] were reasonably trying to reach agreement,' " *id.* (quoting *Egry Register Co. v. Standard Register Co.*, 23 F.2d 438, 443 (6th Cir.1928)). The simplest measure of this royalty is " 'the actual [market] value of what has been appropriated.' " *University Computing*, 504 F.2d at 537 (quoting *Vitro Corporation of America v. Hall Chemical Co.*, 292 F.2d 678, 683 (6th Cir.1961)).

The process of arriving at a "reasonable royalty" is by nature an approximation because plaintiff did not offer its list for sale. Because of the importance of the list, most of these companies do not. Following the Fifth Circuit, though, the Court can still follow an "imaginative" approach in setting an amount for damages to apply the purpose of the Act. Using the benchmarks that Linda Miller set as the vice president of a mail marketing company and expert on the value of these lists,[2] the defendant probably would have "rented" 3,000 names from plaintiff for each use. Because that is the *minimum* plaintiff could have rented,[3] the Court will assume that it did so for fifty separate mailings—one use for each of the *maximum* number of people defendant contacted. Given these assumptions, plaintiff would have paid $22,500 for the fictional license to use the list.[4] This is the most accurate measure of the "reasonable royalty."

Plaintiff contends that the Court should also award costs incurred in developing the list, including promoting the business to potential members and the actual physical compiling of the list. In an open market, these are precisely the types of costs that determine value. Ms. Miller herself stated that the price is set by the cost of compiling and maintaining the list. An award of development costs in addition to market value would be a windfall to plaintiff.

Plaintiff also asks for the $1,178.00 in revenues that defendant received by soliciting plaintiff's members. The Act explicitly states that a "reasonable royalty," when used, is the *exclusive* remedy; therefore the Court will not award that amount in addition.

■ Finally, plaintiff contends that the Court should consider defendant's refusal to return the list in calculating damages. Aside from the uncertainty about the request to return the list, in the case plaintiff has cited, *Kilbarr Corp. v. Business Systems, Inc., B.V.*, 679 F.Supp. 422 (D.N.J.1988), *aff'd without opinion*, 869 F.2d 589 (3d Cir.1989), the court considered that factor because defendant's failure to return the trade secret caused plaintiff harm. Plaintiff here has shown no evidence that, if defendant did fail to return the list upon request, actual harm resulted.[5]

### 2. *Punitive Damages*

■ The Act sets forth the standard for awarding punitive damages in these cases: "If willful and malicious misappropriation exists, the court may award punitive damages in an amount not exceeding twice any award made under ... this section, or $350,000 whichever amount is less." Willful conduct occurs when a party acts without regards for the rights of another, knowing injury will probably follow. *See, e.g., Owens–Corning Fiberglas Corp. v. Watson*, 243 Va. 128, 413 S.E.2d 630 (1992). Malicious conduct occurs

---

**2.** *See Findings of Fact* section *supra.*

**3.** In addition, the "front-loading" probably overstated defendant's number of possible contacts.

**4.** Formula = [3,000 names × ($150/1,000 names)] × 50 uses.

**5.** Both parties presented evidence at trial as to the condition of plaintiff's business at different points, and the possible reasons behind it. By its own admission in its Rebuttal to Defendant's Post–Trial Brief, plaintiff is not seeking to recover lost profits, so the Court need not address the issue.

when a party acts with "ill will" or "spite." *Peacock Buick, Inc. v. Durkin,* 221 Va. 1133, 277 S.E.2d 225, 227 (1981). These are very high standards to meet—Virginia law does not favor punitive damages, and reserves them for only "the most egregious conduct." *Owens–Corning,* 413 S.E.2d at 639.

Plaintiff cites one Fourth Circuit case and one case from the Western District of Virginia in support of its claim for punitive damages. In *Sperry Rand Corp.,* 447 F.2d 1387, the Fourth Circuit upheld an award of punitive damages under Virginia law (but before the Act) against former employees who had conspired to misappropriate trade secrets. The court focused on the fact that these were "serious breaches of loyalty . . . and responsibility" to an employer, the defendants had deliberately planned to cause plaintiff substantial harm, and successfully did so. *Id.* at 1394. In *National Legal Research Group v. Lathan,* No. Civ.A. 92–0031–C, 1993 WL 169789 (W.D.Va. May 17, 1993), after the Act, the defendant was also a disgruntled employee who knew he was going to resign, but waited for over three years, and during that time secretly withheld information from the plaintiff and used the plaintiff's secrets to create his own competing business. *Id.* at * 10. The court held that this "violation of [a] *fiduciary duty* to [the plaintiff] established the willful and malicious aspects of his misappropriation." *Id.* (emphasis added).

Here, there was some evidence that defendant's conduct was willful and malicious, including John Bowers' statement that he wanted to "destroy" plaintiff, and the other disparaging remarks by defendant's representatives. In addition, defendant did know of the importance of the list as evidenced by the contract clause. John Bowers' words, though, were taken out of context. At that time, the relationship between the parties was over, and there never had been the type of fiduciary relationship as between an employer and employee. The people defendant solicited were ones that had used its product before, and that Bowers felt were strong

potential customers. He testified in detail about why he wanted to create a multi-level marketing company—to take advantage of the potential venture, and not to destroy plaintiff.

Both of the cases plaintiff cited involved more flagrant violations than the case before the Court. They were calculated attempts to undermine employers while an employment relationship, which is by its nature trusting, still existed. While defendant's use of the list was reprehensible and illegal, it was not a serious breach of loyalty, and it did not seriously harm the plaintiff.[6] Mr. Bowers' ultimate motive was to contact strong potential clients and develop his own business, and not to ruin plaintiff's. Plaintiff has not shown that defendant acted with conscious disregard for plaintiff's rights, only that defendant acted with anger and used information it should not have. Therefore, the Court cannot find that defendant's actions were willful and malicious, and therefore DENIES plaintiff's plea for punitive damages.

### 3. *Attorneys' Fees*

■ Under the Act, the Court can award attorneys' fees under the same standard as punitive damages—only if the misappropriation was willful and malicious. Va.Code Ann. § 59.1–338.1 (Michie 1992). For the reasons stated above, the Court cannot award attorneys' fees under plaintiff's trade secrets claim.

■ Damages under plaintiff's breach of contract claim differ in this area, though. Plaintiff contends that the clause in the contract stating that "AT agrees to indemnify and hold ABP . . . harmless from any and all claims . . . (including reasonable attorney fees) . . . in connection with the performance of this Agreement" entitles it to collect attorneys' fees. Indemnity is defined as "a contractual right under which the entire loss is shifted from a tortfeasor who is only technically or passively at fault to another who is primarily or actively responsible." Black's

---

**6.** Much of the evidence centered around the state of plaintiff's business throughout the time period of the misappropriation. Although the evidence showed that plaintiff's business was suffering during 1993, the presence of many other factors, including plaintiff's name and product line changes, preclude the Court from finding that defendant's actions caused plaintiff's business to decline.

Law Dictionary 769 (6th ed. 1990). "A contract must be construed as a whole to determine the parties' intent with respect to specific provisions." *Hooper v. Musolino*, 234 Va. 558, 364 S.E.2d 207, 212 (Va.1988), *cert. denied*, 488 U.S. 823, 109 S.Ct. 70, 102 L.Ed.2d 47 (1988). Given the definition of indemnity on its face, clearly this clause did not contemplate defendant paying all attorneys' fees in a claim *between the parties* involving activities after the relationship had ended, but instead in claims that arose because of defendant's actions that might cause plaintiff to be held liable for a technical reason. The Court therefore DENIES plaintiff's request for attorneys' fees under the breach of contract count as well.

## ORDER

For the reasons stated, the Court ORDERS that plaintiff be awarded $22,500.