## CIRCUIT COURT OF THE CITY OF RICHMOND

Eileen Guertler

v.

Ukrop's Supermarkets, Inc.

January 16, 2003

Case No. LP-152-4

BY JUDGE RANDALL G. JOHNSON

This is an action against Ukrop's Supermarkets, Inc., for personal injuries allegedly sustained as a result of the negligent filling of a prescription at one of its pharmacies. It is presently before the court on Ukrop's motion for sanctions for what Ukrop's claims are plaintiff's knowingly false answers to discovery.

The motion for judgment alleges that on January 31, 2000, plaintiff's physician prescribed for her a medication known as Elmiron to treat a medical condition known as interstitial cystitis. She took the prescription to the Ukrop's pharmacy located in its supermarket at Stony Point in Richmond to be filled. Plaintiff alleges that instead of filling the prescription as written, Ukrop's gave her a medication known as Imuran, which is an immuno-suppressant used primarily to treat kidney transplant patients. According to the plaintiff, Ukrop's told her that Imuran was another trade name for Elmiron and that they were the same medication. In fact, they are not. As a result of taking the Imuran, plaintiff claims she has suffered serious and permanent injuries, including lost earnings and earning capacity, and has incurred medical expenses. Suit was filed on January 17, 2002.

Ukrop's served plaintiff with interrogatories. On June 13, 2002, plaintiff answered. Interrogatory No. 3, and plaintiff's answer, are:

60

3. Describe in detail each and every specific injury, whether physical, mental, emotional, or otherwise, claimed to have been sustained in the accident sued upon.

ANSWER: Objection. This interrogatory is overly broad and unduly burdensome in that it seeks [ sic ] plaintiff to describe each and every specific injury claimed as a result of the incident sued upon, however, notwithstanding and without waiving said objection, I suffered severe nausea and violent vomiting for periods of up to three hours at a time on multiple occasions. I also experienced sore throat, chest pains, burping, rashes behind my knees, and hair loss from my scalp. I also missed several days from work and suffered mental anguish due to concerns regarding my health and ability to bear children after having been exposed to Imuran. I suffered difficulty sleeping and felt helpless and isolated after being exposed to a large dosage of a drug which was not prescribed for me. This answer may be supplemented.[1]

Interrogatory Nos. 8 and 9, and plaintiff's answers, are:

8. How long were you confined to bed and/or your home, giving inclusive dates, as a result o[f] the accident[?]

ANSWER: I was confined to my home and to my bed on February 16, 2000, all day long.

9. Describe in detail, if applicable, any pre-accident injury limitation, similar condition, and/or any aching, pain, or discomfort in any parts of the anatomy alleged injured in this accident.

ANSWER: Not applicable.

---

[1] Although neither party raised plaintiff's objection to the interrogatory as a basis for granting or denying the motion for sanctions, the court does not understand how a plaintiff seeking to recover for personal injuries from a defendant can ever object to that defendant's asking, through timely discovery, what personal injuries are claimed.

Interrogatories 13 and 14, and plaintiff's answers are:

13. Describe in detail all accidents or injuries you experienced at anytime prior to or subsequent to the date of the accident set forth in the Motion for Judgment.

ANSWER: Objection. This interrogatory seeks information that is irrelevant and seeks information that is not otherwise reasonably calculated to lead to the discovery of admissible evidence. However, notwithstanding and without waiving said objection, I sprained my back in December of 1988 while playing basketball. I suffered a slipped disc in my back in January 1993 from playing basketball.

14. Describe any and all health problems, infirmities, limitations, and/or disabilities which pre-existed the accident sued upon in this action.

ANSWER: Objection. This interrogatory is overly broad and unduly burdensome, and seeks information that is irrelevant and is not otherwise reasonably calculated to lead to the discovery of admissible evidence. However, notwithstanding and without waiving said objection, I was diagnosed with an Interstitial Cystitis in January of 2000. I had a bladder biopsy. I had outpatient surgery in January for the biopsy.

Ukrop's counsel took plaintiff's deposition on October 4, 2002. After it was established that the onset of plaintiff's physical problems in the case at bar was February 15, 2000, and after plaintiff had described what those problems were, the following questions and answers took place:

Q. Prior to February 15th had you ever gone to see a doctor — I'm talking February 15th of 2000 — had you ever gone to see a doctor or been treated for nausea?

A. No, I don't believe so. . . .

Q. Had you ever had headaches so bad that you complained to the doctor of headaches before February 15th of 2000?

A. No, I don't believe so.

Q. So you had those problems on the evening of February 15th. Did they come on you gradually over the day or just suddenly?

A. I do recall just feeling rather worn out and, as a result of that all, just went to bed.

Q. At the time did you think of any particular reason why you felt worn out?

A. No.

Q. Had you ever had any problem prior to February 15th, 2000, with fatigue or anemia or anything like that for which you've seen a doctor?

A. No.

Q. You've always had a good energy?

A. I've always been relatively healthy. . . .

Q. The chest pain that you were having on February 16, had you ever had chest pains prior to February 16, 2000?

A. No.

Q. Never seen a doctor for chest pain?

A. No.

Q. Never complained of chest pain B

A. No.

Q. — to a doctor?
A. No. . . .

Q. Did you see any doctor that day?

A. I tried to see Dr. McMurtry.

Q. On February 16, 2000?

A. Yes.

Q. Did you get in to see him?

A. No, I did not see him that day.

Q. Did you basically stay at home that day in bed?

A. Yes.

Q. Not feeling well?

A. Yes.

Q. Didn't go out for any reason?

A. No.

Q. Didn't see anyone?

A. Didn't see anyone. . . .

Q. In your adult life do you consider yourself a person who's taken a lot of different medications?

A. No.

Q. No. Have you ever had a reaction to a medication or a drug?

A. Penicillin.

Q. Other than the allergy to penicillin, no other allergic reactions to drugs?

A. No.

Through subpoenas duces tecum, Ukrop's counsel has obtained several of plaintiff's medical records. Those records show that the responses made by plaintiff to the above interrogatories and at her deposition are not true.

On December 8, 1998, plaintiff went to Dr. Leon O. Spiers, III, with the following complaints:

> 1 month of cough and chest congestion. It waxes and wanes, but has been worse over the past few days. She gets coughing fits, which sometimes take her breath and cause a burning discomfort throughout her chest. . . . [s]he has had upset stomach, loose stool, and bad taste in her mouth.

On September 1, 1999, she went to Dr. Kelly McDonald after experiencing pain and cramping in her calf. According to Dr. McDonald, plaintiff "note[d] a history of iron deficiency anemia. She wonders if this has anything to do with her cramping." After a follow-up visit six days later, Dr. McDonald wrote that plaintiff had been prescribed the drug Bactrium, but "was having a lot of nausea and vomiting on the Bactrium" and was changed to another medication.

On October 10, 1999, plaintiff went to The Urology Center complaining of recurrent urinary tract infections. Her symptoms, according to the Center's report, were "notable for trouble sleeping and headaches." There is also a report from the MCV Sports Medicine Center indicating that plaintiff visited that facility on February 16, 2000, complaining of pulling her left calf, apparently while playing volleyball or running. February 16, 2000, is the day she said in answer to interrogatories and in depositions that she spent all day in bed as a result of taking the Imuran wrongfully given to her by Ukrop's.

From the above, it is clear that plaintiff was not truthful in her discovery responses. While the court agrees with her counsel's observation at the hearing on Ukrop's motion that no one can remember every ache and pain experienced over a lifetime, or even every visit to a doctor, the court does not believe that plaintiff did not remember her complaints of chest pain, nausea, anemia, vomiting, trouble sleeping, and headaches that were serious enough to seek medical attention on at least four occasions in the fourteen months immediately prior to the incident now at issue. Moreover, plaintiff was not present at the hearing on Ukrop's motion and has not attempted to explain to the court in any other way why her answers were not accurate. The court does not accept her counsel's explanations, which basically were couched in terms of what most people remember and how most people would have answered

the questions. The questions asked of the plaintiff were clear and straightforward. Her answers were a conscious attempt to conceal the truth.

In *Mayfield v. Southern Ry.*, 31 Va. Cir. 229 (1993), this court said:

> Pretrial discovery is an integral part of the judicial process. The Rules of the Supreme Court of Virginia, as well as the guidelines promulgated by this court, point to the importance placed upon discovery by the judiciary. When parties engage in discovery, answers to that discovery must be responsive, honest, and complete. If they are not, and if the deficiency is the result of a *deliberate* attempt to avoid the discovery rules, sanctions under Rule 4:12 are appropriate. If a discovery response is in writing, and if it is not responsive, honest, and complete as a result of a *deliberate* attempt to avoid the discovery rules, sanctions under Va. Code § 8.01-271.1 are appropriate as well. . . .
>
> [D]iscovery is one of the integral parts of our judicial system. Litigants must not be allowed to toy with that process, or to provide anything other than honest and good-faith responses to discovery. Anything less destroys the very purpose of discovery and is unacceptable. Where, as here, a litigant deliberately withholds relevant information in the face of a clear, direct, and unambiguous request for such information, sanctions not only should, but must, be awarded.

31 Va. Cir. at 235-36 (emphasis in original).

Sanctions must be awarded here. Ukrop's asks the court to dismiss the lawsuit. Although the court has the authority to take such action, *see* Supreme Court Rule 4:12(b)(2)(C), and has taken such action in the past, *Harris v. Van Dyer*, Case No. LE-1542-3 (Order entered May 3, 1999; Markow, J., presiding), the court believes that such action is too severe under the facts of this case. A more appropriate sanction is the one imposed by this court in *Ellerbe v. Lowe's Home Center*, 47 Va. Cir. 464 (1998). In that case, the plaintiff had given false discovery answers concerning prior accidents and injuries to his back, as well as false information about lost profits. In addition to dismissing the lost profits claim, the court held that, if the case was tried and a verdict was returned for the plaintiff, plaintiff had to pay the defendant 25% of such verdict. If the case was settled, no formal sanction would be imposed since the court would assume that the parties had considered the sanction otherwise imposed in arriving at the settlement amount.

The court will impose a sanction in this case of 25% of the plaintiff's verdict if the case is tried and a plaintiff's verdict is returned. Otherwise, no sanction is imposed.

A copy of an order is enclosed. The order includes the court's denial of defendant's motion in limine, which was not taken under advisement.