# CIRCUIT COURT OF THE CITY OF MARTINSVILLE

David Nelson French

v.

Jack Allan Painter et al.

March 27, 2013

Case No. 11-71

BY JUDGE G. CARTER GREER

In this medical malpractice action, which has a tortuous procedural history, the plaintiff alleges in his first amended complaint that Dr. Jack Painter,[1] an interventional cardiologist, negligently performed a cardiac catheterization by improperly utilizing a vascular closure device ("device"), with the result that the plaintiff suffered a complete occlusion of blood flow to his right leg. The plaintiff further alleges that it was necessary for him to be transported emergently to Carilion Roanoke Memorial Hospital, where he underwent vascular surgery on an emergency basis. The plaintiff further alleges that, as a consequence of the lack of blood flow to his leg, he developed reflex sympathetic dystrophy/comprehensive regional pain syndrome, a permanent neurological injury.

Pursuant to Rule 4:12, Va. Code § 8.01-271.1, and the inherent power of the court, the plaintiff has filed a motion for sanctions, asking the court to strike the defensive pleadings and grant summary judgment on the issue of liability. In general, the plaintiff asserts that the defendant has perpetrated fraud on the court by engaging in "a continuing pattern of illegal, devious, misleading, deceptive conduct, tending to obstruct justice and to undermine the [c]ourt's ability to fairly adjudicate the case." Motion for Sanctions at 2-3. Specifically, the plaintiff contends: (1) "that the defendant has deliberately and knowingly been less than truthful in answers to discovery," (2) "that the defendant has surreptitiously accessed and copied the plaintiff's confidential medical records" in violation of state and federal law, (3) "that

---

1. The plaintiff named both Dr. Painter and his professional corporation as defendants. For the purpose of clarity, this opinion will refer to Dr. Painter as the defendant or by name.

the defendant has improperly used the information so obtained to attempt to influence the plaintiff's need for subsequent medical treatment . . . [by having] improperly contacted a material witness," and (4) that the defendant has intentionally concealed evidence. *Id.* at 1-2. The plaintiff makes no accusations of improper conduct against the defendant's lawyers, who have sterling reputations; it is the defendant's conduct that is at issue. Mr. Peake represents the defendant with respect to the underlying allegations of the lawsuit, while Mr. Leitch is the defendant's personal counsel concerning the motion for sanctions.

Following the filing of the motion for sanctions, the court conducted three evidentiary hearings, during which the court heard the testimony of five witnesses, including Dr. Painter, who was called as an adverse witness on behalf of the plaintiff. The plaintiff also introduced numerous exhibits, which consisted primarily of depositions and interrogatory answers. The parties have filed excellent memoranda, which the court has reviewed, along with all of the testimony and exhibits, and the court makes the following findings of fact.

## I. *Findings of Fact*

On the morning of April 1, 2011, Deputy Dean Comer of the Martinsville Sheriff's Office personally served the complaint on Dr. Painter at his office in the City. The proof of service, which was introduced as Exhibit 8, confirms that the defendant received personal service, in spite of his testimony that he was at Memorial Hospital of Martinsville and Henry County ("the hospital") and was not personally served with the complaint. Referring to the plaintiff as a "bum," raising objections on his own, and calling himself "Houdini" during his testimony, the defendant displayed a scornful demeanor, and his testimony as a whole was not credible. Had Deputy Comer not found Dr. Painter and had the deputy left the complaint with "a person in charge" (Tr., December 6, 2012, at 109), a different stamp would appear at the bottom of the proof of service.

Later the same morning, either Dr. Painter or one or more of his employees at his direction, using computer terminals with passwords, obtained access to the hospital's information system and, in turn, the plaintiff's complete medical chart. The defendant or someone at his direction proceeded to copy thirty pages of records, most of which pertained to the cardiac catheterization performed by the defendant on July 7, 2009. However, eight pages of the records pertained to the plaintiff's admission on April 18, 2010, to the hospital for treatment of addiction to alcohol, pain pills, and marijuana. The admission history and physical states in part that the plaintiff "became pill-addicted in the last year or so since he has been diagnosed with regional pain syndrome of [the] right foot related to cardiac catheterization complications. He is taking 10—20 Percocet 10/650. Francis Walsh, M.D., is his primary physician who is treating his regional pain syndrome for

the pain medicine. He has been buying some pain pills off the street." *See* Exhibit 1, March 4, 2013, at 30. Contrary to his testimony, the court finds that Dr. Painter read the records and that, on April 14, 2011, his office sent them via facsimile to his attorney, Robert Donnelly. *Id.* at 1. Mr. Donnelly and his firm withdrew from representation of the defendant shortly after the defendant gave his deposition. *See* Exhibit 9. It is beyond dispute that Dr. Painter played no part in the admission of April 18th and that he had no legitimate reason to obtain the records of that admission.

In late April 2011, Donald Craighead, the manufacturer's representative of the device, received a request from the hospital for a copy of the instructions for use concerning the device. When he delivered the instructions for use to the hospital, the hospital's catheterization laboratory director called and told him that he needed to talk to Dr. Painter. Craighead then went to the defendant's office and met with the defendant, who told Craighead that "he had had an incident where a patient had had a complication with an Angio-Seal device. . . ." (Craighead Dep., at 35.) Craighead replied that the complication rate was "relatively low." The defendant proceeded to tell Craighead "that he would go in from the contralateral side and pop it open, but that this one would not pop open and got sent to Roanoke Memorial." The defendant wanted to know if other doctors had seen "any specific complications that he was looking for in regard to cutting off the blood flow, occluding the blood flow." (Craighead Dep., at 35-36.) Craighead told the defendant that he would search the literature in order to find studies showing the safety and efficacy of the device. The defendant asked Craighead the specific ways in which the blood flow could be cut off, and they discussed the issue of plaque in the artery. Craighead asked Dr. Painter "if he had a groin shot," a colloquialism for a femoral angiogram film, to which the defendant answered that he did not. (Craighead Dep., at 37.) At no time during the meeting did the defendant identify the plaintiff by name.

At some time after the filing of the lawsuit but before the defendant gave his deposition, there was a chance encounter between Dr. Painter and Dr. Walsh, the plaintiff's treating neurologist, at the hospital. Under examination by the defendant's attorney, Dr. Walsh described what happened as follows in his deposition:

> Q. And had you had an opportunity either at this time or subsequently to speak with Dr. Painter about the procedure?
>
> A. No. I have spoken to him on one occasion about it. He brought it up when we just happened to be in the hospital one time.

Q. Do you have any recollections of what was discussed, when that discussion may have occurred, things of that nature?

A. It occurred a while ago. He had asked me – I do not know if he had seen records from me or not, but he talked about what had happened, basically said he did nothing wrong and that the patient was a malingerer, and I should just leave him alone.

Q. Besides what we have discussed, do you remember any medical specifics or things that Dr. Painter may have told you about the procedure or his treatment?

A. I do not remember what he said about the procedure. I was more taken aback by his opinion of the patient.

Q. Do you recall any specifics? I know you gave me a generalization, but if you have any quotes or things that stick out to you, I would like to know them from that conversation.

A. Again, as far as the procedure, he said he did everything right. He did not think anything went wrong. He felt that the patient just wanted drugs.

Walsh Dep., at 23-24.

During cross-examination by plaintiff's counsel, the following exchange took place:

Q. You also mentioned an encounter, one encounter, that you had had with Dr. Painter. Was there anything said by Dr. Painter in that encounter with you that led you to believe that he had looked at David's records from that hospitalization?

A. No. That was not mentioned specifically. I don't know if he had looked at the records. He did not mention anything about his hospitalization that I recall, but he did comment that he felt that he was a drug abuser. I do remember that.

Walsh Dep., at 80.

What was Dr. Painter's intent in engaging in this conversation? When the conversation took place, the defendant, having read the records from

the April 18th admission, knew that Dr. Walsh was treating the plaintiff's neurological condition and that the plaintiff had become addicted to pain medication. The defendant explained in his deposition that he was "finding out what neurologic workup had been done on this patient to ascertain any scientific evidence for nerve damage in his leg" (Painter Dep., p. 58), an explanation which the court does not accept. The defendant was thoroughly familiar with the confidentiality requirements of federal law, and he had to know that Dr. Walsh could not discuss with him the plaintiff's neurological condition or the plaintiff's admission of April 18, 2010. *See* the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d, *et seq.* (HIPAA). In telling Dr. Walsh, the very physician who was treating the plaintiff for alleged sequela of the procedure performed by Dr. Painter, that the plaintiff was a drug abuser and malingerer whom he should, in effect, abandon, Dr. Painter was not simply "venting" as the defendant suggests. Opposition to Plaintiff's Motion for Sanctions, at 7. The only logical conclusion is that the defendant was acting with the intent improperly to influence a material witness.

On May 27, 2011, the defendant gave his deposition, in which he made the following statements: (1) that he had not seen any medical records concerning the plaintiff since the date of the catheterization performed on July 7, 2009, other than the operative report of the vascular surgeon (Painter Dep., at 57), and (2) that he had not talked to anyone about the plaintiff, other than Dr. Walsh (Painter Dep., at 58-59). These statements were false, and the defendant knew that they were false. With regard to the medical records that his office obtained through the hospital's information system, Dr. Painter testified that he never read them (Tr., January 22, 2013, at 32); however, it is inconceivable that the defendant did not read the records before faxing them to Richmond counsel, in light of the confrontation with Dr. Walsh. The only records that referred to the plaintiff's drug abuse were the records of the April 18th admission. The defendant's testimony that, by the time of the conversation with Dr. Walsh, he had learned of "what was in [the plaintiff's] various records" from "discussions with [his] lawyers in Richmond. . . ." (Tr., January 22, 2013, at 34) was not credible. With regard to the second statement, the conversation between the defendant and Donald Craighead took place one month prior to the defendant's deposition, and it is unlikely that the defendant did not remember having spoken to Craighead about such an important subject. While it is true that Dr. Painter at no time mentioned the name of the plaintiff, that circumstance hardly excuses the defendant's answer, since the conversation revolved around the plaintiff's catheterization.

During the defendant's deposition, plaintiff's counsel gave the defendant an anatomical drawing and asked him, "could you look at this and give me some idea where the puncture site would have been on Mr. French?" Protesting that "[t]his drawing is not a very accurate drawing"

(Painter Dep., at 36), the defendant, nevertheless, took a pen, made a mark on the drawing, and said, "[s]o it is generally in this region here that we will place the needle." (Painter Dep., at 36.) Plaintiff's counsel then asked that Dr. Painter use a red pen to depict "the approximate location that [the defendant] meant . . . for the site," at which point the defendant, stating that he was "not going to use an inaccurate drawing any more," refused to draw any further. (Painter Dep., at 37-38.) Plaintiff's counsel resumed his examination without moving for the introduction of the drawing. A short time later, Plaintiff's counsel, intending to make the drawing an exhibit, said, "[b]efore I forget it, the drawing that you said was imprecise, what did we do with that?" (Painter Dep., at 54.) The drawing had disappeared, so a break was taken, during which the attorneys and the court reporter looked through files and briefcases in order to find it. However, the drawing could not be located.

The drawing reappeared twenty months later. During the defendant's testimony at the second hearing on the motion for sanctions, the following exchange occurred:

Q. And do you remember approximately twenty minutes after that we got ready to introduce that as an exhibit, and it could not be found. Do you remember that?

A. I do.

Q, Do you know what happened to it?

A. I had put it in my coat pocket, shortly after I had done the drawing.

Q. When did you do that?

A. Probably within five minutes of having done the drawing.

Q Did you know --

A. I mean I was embarrassed, when you went looking for it again, that I had it in my coat pocket.

Q. Did you put it in your coat pocket during the break?

A. No.

Q. How did you manage to get it off the table and get it in your coat pocket without anybody seeing you?

A. I guess I am just Houdini.

Q. Did not you have to fold it?

A. I did.

Q. How many times did you have to fold it, to get it in your coat pocket?

A. I do not recall.

Q. And why did you take it?

A. Well, I guess it was just an impulse; that I knew it was not any part of David French's record, and it was just a generalized thing that showed where I get access on ten thousand people that I have done a cath on in the last quarter of a century, and I had regretted even doing any kind of a drawing on something that was not anatomic.

Q. You knew it was not yours?

A. Well, I had done the drawing, so the drawing part of it was mine, at that point. I would disagree with that.

Q. So you thought you had a right to take it?

A. No. I did not really think about it too much. I just, it was an impulse. I put it in my pocket, and that was the end of it.

Q. Do you recall when I asked to have it marked as an exhibit and could not find it, do you remember me looking for it?

A. I do.

Q. Do you remember the court reporter looking for it?

A. I remember you looking for it. I mean I was not paying attention to what she was doing.

Q. You did not see her get down under the table, looking for it?

A. I do not remember that.

Q. Did you see your own lawyers looking for it?

A. They looked on the desk.

Q. But you knew all the time they were not going to find it, unless they looked in your pocket?

A. That is true.

Tr., January 22, 2013, at 43-45.

The defendant turned the document over to his personal counsel just prior to the second hearing on January 22nd, and, after this line of questioning, Mr. Leitch handed the document to the court, which admitted the document as Hearing Exhibit 1. The court does not ascribe any improper conduct to Mr. Leitch, for whom the court has the highest respect. The defendant's actions in withholding the drawing until the second hearing, without notifying his personal counsel that he, in fact, had possession of the document, placed his personal counsel in the awkward position of having argued incorrectly but ingenuously at the first hearing that there was no evidence that the defendant had anything to do with the disappearance of the drawing. (Tr., December 6, 2012, at 34.)

Soon after the defendant's deposition, the plaintiff sent a second set of interrogatories to the defendant. Interrogatory number four stated as follows: "Do you have any current knowledge of the whereabouts of the anatomical drawing on which you made entries during your deposition? Do you know what happened to the document during the deposition?" *See* Exhibit B to Plaintiff's Memorandum in Support of Motion for Sanctions for Discovery and Other Misconduct. The defendant's answer, to which he

signed a declaration pursuant to Va. Code § 8.01-4.3, was that "[d]efendant is not in possession of this drawing and does not know where it is located." *See* Exhibit 11. This answer was without question false and misleading. Nevertheless, in his testimony at the second hearing, the defendant insisted that his answer was truthful on the ground that he had moved in March 2012 "and in the move lost the drawing and had no idea where it was." (Tr., January 22, 2013, at 49.) This testimony was plainly absurd, for the defendant knew that he had possession of the document — he just forgot where he had placed it.

On October 11, 2012, the plaintiff took the deposition of Andrea Dalton, an employee of Dr. Painter. The plaintiff had acquired from the hospital a computer printout showing that, on the morning of April 1, 2011, Dalton, or someone using her password, obtained access to the plaintiff's medical records three separate times. *See* Exhibit 10. Dalton denied having accessed the records because she did not work on that day. The following exchange then occurred:

Q. Are you saying that, on April the 1st, 2011, you know that you did not look up or access these records because you were not working that day?

A. That is correct. I was not working that day.

Q. And how do you know that?

A. We have time sheets that we keep up with.

Q. Well, how would you know to be looking at those time sheets to determine the date that was important?

A. I do not know.

Q. Can you tell me some other dates, specific dates in 2011, that you did not work?

A. I could probably think of a few if you give me time to look at my calendar.

Q. Ms. Dalton, someone had to tell you before you came into the deposition today that April the 1st, 2011, was the date that

you were going to be questioned about. Somebody told you that, didn't they?

A. Yes, sir.

Q. Who was it?

A. I think it was Dr. Painter one day this week. I cannot remember the day.

Q. Was that at the same time that he told you that you needed to be here?

A. Yes, sir.

Q. And what else did he say?

A. Just that I needed to be here and it was talking about a date in 2011 that I was not here. I was not working that day.

Q. Did he suggest to you that you were not working that day or did he. . . .

A. No, sir. I have a time sheet.

Q. Ma'am, what I need you to tell me, and I know you are trying as best you can, but it just happened last week, I need for you to recreate for us as best you can the total substance of the conversation that occurred between you and Dr. Painter. Where were you? What were you doing? How did he bring it up? What did he say to you? What was your response? It is very important that you try to recreate that as best as you can. . . .

Q. All right. So when did the conversation occur between you and Dr. Painter, before or after you met with the attorneys?

A. Before. After I got off the phone with them, I asked him what did I do? What has happened?

Q. And what did he say?

A. He said, "You just need to do what they say." And he said he thought it was around this time and he pulled my time sheet to let me know that I did not work. That I had nothing, no involvement.

Q. And that is all you can remember that he said?

A. Yes, sir.

Dalton Dep., at 21-24.

On November 30, 2012, Matthew Kelley, Mr. Peake's associate who defended Dalton's deposition, sent the court a letter stating that "[f]ollowing her deposition, Ms. Dalton told me that, while she had been truthful in her testimony, she had failed to mention a conversation with Dr. Painter that occurred prior to the deposition. In that conversation, Dr. Painter said something to the effect of 'do not tell the attorney that you and I [Dr. Painter] talked before your deposition'." Mr. Kelley further informed the court that Dalton did not include this information in her errata sheet and that he believed his ethical obligations required disclosure of the information. See Rule 3.3(d) of the Rules of Professional Conduct, stating that "[a] lawyer who receives information clearly establishing that a person other than a client has perpetrated a fraud upon a tribunal shall promptly reveal the fraud to the tribunal." Interestingly, in her testimony at the second hearing, Dalton denied that the defendant had made that statement, and she stated that Mr. Kelley had misunderstood her. (Tr., January 22, 2013, at 73.) Did Mr. Kelley misunderstand what Dalton said or did Dr. Painter, in effect, influence Dalton to testify falsely? If Mr. Kelley is correct, the clear implication of Dalton's omitted statement is that, if plaintiff's counsel were to ask in the deposition whether Dr. Painter and she had talked about her prospective testimony, Dr. Painter wanted her not to tell the truth. Dalton testified in a seemingly forthright manner at the second hearing, apparently in stark contrast to her demeanor during her deposition, when she admitted that she was nervous. On the other hand, a lawyer does not lightly write a letter to the court such as Mr. Kelley wrote. The court is of the opinion that Mr. Kelley did not misunderstand Dalton, that Dalton testified untruthfully at the second hearing, and that, prior to her deposition, Dr. Painter told her not to tell plaintiff's counsel that he, Dr. Painter, and she had talked.

## II. *Conclusions of Law*

Although the plaintiff seeks sanctions under Rule 4:12, the rule is inapplicable in these circumstances. In order for the rule to apply, the court must first enter an order compelling discovery. Rule 4:12(b)(2) states in part that "[i]f a party . . . fails to obey an order to provide or permit discovery . . . the court in which the action is pending may make such orders in regard to the failure as are just. . . ." *See Brown v. Black*, 260 Va. 305, 534 S.E.2d 727 (2000) (holding that trial court erred in dismissing motion for judgment on ground that no motion to compel had been entered under Rule 4:12); *Nolte v. MT Technology Enterprises*, 284 Va. 80, 726 S.E.2d 339 (2012) (holding that trial court had authority to impose sanctions because defendants violated discovery order, but that choice of sanction was abuse of discretion). In this case, the court has entered no motion to compel or other discovery order, other than the standard pretrial scheduling order, which is not sufficient to invoke the sanctions of Rule 4:12 under the court's factual findings.

Likewise, Va. Code § 8.01-271.1 does not authorize the court to impose sanctions in this case. This statute states in part as follows:

> The signature of an attorney or party constitutes a certificate by him that (i) he has read the pleading, motion, or other paper, (ii) to the best of his knowledge, information, and belief, formed after reasonable inquiry, it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and (iii) it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

*Id.* By its express terms, the statute applies only when an attorney or party has signed a "pleading, motion, or other paper" in contravention of the listed requirements. *See* generally *Ford Motor Co. v. Benitez*, 273 Va. 242, 639 S.E.2d 203 (2007); *Williams & Connolly v. PETA*, 273 Va. 498, 643 S.E.2d 136 (2007). In accordance with the findings of fact, the only document that Dr. Painter himself signed was his interrogatory answer, which is obviously not a pleading or motion. But is an interrogatory answer an "other paper" within the meaning of the statute? In *Lester v. Allied Concrete Co.*, 80 Va. Cir. 454 (2010), the court found that "[t]hough literally 'other papers' falls within the ambit of Va. Code § 8.01-271.1, certification requirements for discovery papers should be governed by new Rule 4:1(g), the specific provision for pretrial discovery." *Id.* This court is inclined to agree. Since Rule 4:1(g), which mirrors § 8.01-271.1 for the most part, applies only to discovery responses of attorneys and parties not represented by counsel, that rule is also inapplicable in this context.

The parties essentially agree that the main issue confronting the court is whether the defendant has committed fraud on the court that the court may punish in the exercise of its inherent power. In *United States v. Shaffer Equipment Co.*, 11 F. 2d 450 (4th Cir. 1993), the Court of Appeals for the Fourth Circuit described the inherent power of the federal courts as follows:

> Due to the very nature of the court as an institution, it must and does have an inherent power to impose order, respect, decorum, silence, and compliance with lawful mandates. This power is organic, without need of a statute or rule for its definition, and it is necessary to the exercise of all other powers. Because the inherent power is not regulated by Congress or the people and is particularly subject to abuse, *it must be exercised with the greatest restraint and caution, and then only to the extent necessary.*

*Id.* at 461 (emphasis added; citation omitted). *See* also *Chambers v. Nasco, Inc.*, 501 U.S. 32 (1991) ("Because of their very potency, inherent powers must be exercised with restraint and discretion. A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process."). "A federal court has the inherent authority to impose sanctions for fraud on the court or abuse of the litigation process." *Holmes v. Wal-Mart Stores East, L.P.*, 2011 U.S. Dist. Lexis 46020 (E.D. Va. 2011). *See SunTrust Mortgage, Inc. v. AIG United Guaranty Corp.*, 2011 U.S. Dist. Lexis 33118 (E.D. Va. 2011) ("By now it is well-settled that fraud on the court or abuse of the judicial process warrants use of the inherent power to impose sanctions on the offending party or its counsel, or both.").

Though the Supreme Court of Virginia has not defined the phrase "fraud on the court," the Court has stated that, in determining whether a party has committed fraud on the court, "a controlling factor is 'whether the misconduct tampers with the judicial machinery and subverts the integrity of the court itself'." *Owens-Corning Fiberglass Corp., v. Watson*, 243 Va. 128, 142, 413 S.E.2d 630 (1992), quoting *United Business Communications, Inc. v. Racal-Milgo, Inc.*, 591 F. Supp. 1172, 1186 (D. Kan. 1984). The federal courts of the Eastern District of Virginia utilize the following definition of the phrase:

> A "fraud on the court" occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier of fact or unfairly

hampering the presentation of the opposing party's claim or defense.

*SunTrust Mortgage, Inc., supra,* at 41-42; *Holmes, supra,* at 11. Fraud on the court must be proven by clear and convincing evidence. *Id.* Since the general statement by the Supreme Court of Virginia does not conflict with the above definition, this court adopts the definition of "fraud on the court" promulgated by the federal courts.

Some appellate courts have upheld the dismissal of all or part of a claim on the basis of a plaintiff's testifying falsely in a deposition. The case of *Baker v. Myers Tractor Services, Inc.,* 765 So. 2d 149 (Fla. App. 2000), is illustrative. In that case, the plaintiff, who suffered a knee injury, denied in his deposition that he had sustained a prior injury to his knee. However, medical records obtained by the defendants showed that the plaintiff, in fact, had injured his knee while playing football in high school. The trial court then granted the defendants' motion to dismiss as a sanction for the plaintiff's false testimony. In affirming the decision of the trial court, the Florida Court of Appeals stated as follows:

> [T]his Court concludes that Baker knowingly and intentionally concealed prior injuries to his right knee in an attempt to gain an unfair advantage in this litigation. Such conduct is a serious affront to the administration of justice. *Honesty is not a luxury to be invoked at the convenience of a litigant. Instead, complete candor must be demanded in order to preserve the ability of this court to effectively administer justice.* . . . A system that relies upon an adversary's ability to uncover falsehoods is doomed to failure. In the instant case, the repeated lies by Baker constitute knowing intentional misconduct justifying dismissal. This is particularly true, given that these misrepresentations occurred repeatedly and went to the central issue in this case. If these misrepresentations had remained undiscovered, the ability of this Court to impartially adjudicate this claim would have been seriously impaired. While it is clear that every litigant has the right to proceed forward, it is equally clear that this is a right which can be forfeited. Given the serious nature of Baker's misconduct, this Court not only has the right, but the obligation to involuntarily conclude these proceedings.

*Id.,* at 150 (emphasis added). *See also Pierce v. Heritage Properties, Inc.,* 688 So. 2d 1385 (Miss. 1997) ( plaintiff lied in deposition that she had been alone in bed when ceiling fan fell on her); *Reed v. Furr's Supermarkets, Inc.,* 11 P.3d 603 (N.M. App. 2000) (plaintiff misrepresented her medical history during deposition).

The leading case in Virginia appears to be *Holmes, supra*, in which the Equal Employment Opportunity Commission (EEOC) alleged that Wal-Mart had violated the Americans with Disabilities Act of 1990 by failing to provide reasonable accommodation to Holmes for her disability. During her deposition, Holmes testified falsely concerning the extent of her mental health treatment resulting from her employment. After a second deposition, in which Holmes admitted that she had withheld relevant documents that Wal-Mart had requested, Wal-Mart moved for dismissal of the complaint as a sanction for Holmes' fraud. The magistrate judge found that Holmes had committed fraud on the court and granted the motion to dismiss. In upholding the decision of the magistrate as to the finding of fraud, the district court stated as follows:

> In sum, the record evidence clearly and convincingly establishes that Holmes has engaged in a pattern of misconduct in this litigation that includes, (i) making false statements to the EEOC that resulted in the EEOC providing false discovery responses to Wal-Mart, (ii) providing false testimony during depositions, (iii) intentionally failing to produce relevant documents, and (iv) providing false testimony at the evidentiary hearing. As the Magistrate Judge correctly concluded, Holmes' conduct clearly and convincingly reflects an intentional scheme to hinder Wal-Mart's access to relevant evidence and to prevent the fair adjudication of her claims.

*Id.*, at pp. 19-20. Finding that dismissal of the case was not appropriate, the district court struck Holmes' claim for compensatory damages as a sanction.

One circuit court has held that false testimony in a deposition, in and of itself, justifies the imposition of a sanction, though not dismissal of the action. In *Ellerbe v. Lowe's Home Center, Inc.*, 47 Va. Cir. 464 (1998), Ellerbe denied in his deposition having received treatment for back pain prior to his accident at Lowe's, despite the fact that the medical records showed that he had received treatment for numerous back injuries. In assessing a sanction of twenty-five percent of any verdict returned in Ellerbe's favor, the court stated that *"[a] party's obligation to be truthful during discovery is absolute." Id.* (emphasis added). *See Guertler v. Ukrop's Supermarkets, Inc.*, 61 Va. Cir. 59 (2003) (Guertler testified untruthfully in deposition as to medical history, and court imposed sanction of twenty-five percent of any verdict returned for Guertler); *Mayfield v. Southern Ry.*, 31 Va. Cir. 229 (1993) (Mayfield gave false testimony in a deposition as to existence of prior shoulder problems, and the court imposed a $10,000 sanction).

The duty to tell the truth applies with equal force to an interrogatory answer. In *Smith v. Cessna Aircraft Co.*, 124 F.R.D. 103 (D. Md. 1989), the defendants propounded an interrogatory asking that the plaintiff state

his income from 1981 through 1987 as reflected on his federal income tax returns. In his answer, the plaintiff listed figures that were fraudulent, since the plaintiff had failed to file tax returns for the years 1983 through 1987. However, at the end of the answers, the plaintiff signed his name below the statement, "I declare under penalty of perjury that the foregoing is true and correct." The defendants uncovered the plaintiff's malfeasance and took the plaintiff's deposition, during which the following testimony occurred:

Q. So your affirmation at the end that this is true under penalty of perjury, that is not accurate, is it?

A. The answers to the interrogatories in that instance is [sic] not correct.

Q. So your statement you declare under penalty of perjury that the foregoing answers and responses are true and correct, that certification signed by you was not accurate, was it?

A. In this case, that is correct.

Q. So you committed perjury in that case, didn't you?

A. I would believe you would call it that, yes.

Q. What would you call it? You would call it perjury, too?

A. Yes.

*Id.*, at 105. Granting in part the defendants' motion to dismiss by striking the plaintiff's lost wage claim, the district court quoted from a Missouri case as follows: "Parties like witnesses are required to state the truth, the whole truth, and nothing but the truth in answering written interrogatories." *Id.*, at 109-10, *quoting Hunter v. International Systems & Controls Corp.*, 56 F.R.D. 617, 631 (W.D. Mo. 1972).

Similarly, the Supreme Court of Virginia takes a dim view of a false interrogatory answer. In *Owens-Corning Fiberglass Corp., supra*, the issue was whether a memorandum from the defendant's medical director to the defendant's in-house counsel was protected by the attorney-client privilege. The memorandum, which was written at the request of counsel for the purpose of supplying an interrogatory answer in a federal case in Texas, stated that asbestosis "was well known and well documented in the literature

during the entire time that [the plaintiff] used the insulation." *Id.*, 243 Va. at 141. After receiving the memorandum, the defendant answered the interrogatory by stating that it "has no information or belief that prolonged use of its products containing asbestos fibers will cause 'asbestosis'." *Id.*, 243 Va. at 141. The trial court ruled that the memorandum was not protected by the attorney-client privilege because the defendant had committed an act of fraud by answering the interrogatory in a manner inconsistent with the information contained in the memorandum. In affirming the trial court, the Supreme Court of Virginia cited *Smith, supra,* with approval and stated as follows:

> We hold that, under the facts of this case, the trial court did not err in holding that the attorney-client privilege did not extend to the Konzen memorandum because Owens-Corning committed a fraud upon the Texas court. Owens-Corning's in-house counsel received the Konzen memorandum on February 9, 1968. Yet, five days later, Owens-Corning filed an answer to an interrogatory under oath. *The answer contained a statement which Owens-Corning knew was patently false. This false statement, under oath, constituted a fraud upon the Texas court* and, thus, the Konzen memorandum which reveals this fraud is not protected by the attorney-client privilege.

*Id.*, 243 Va. at 142 (emphasis added).

Citing *Bower v. Weisman*, 674 F. Supp. 109 (S.D. N.Y. 1987), and *Doe v. Federal Grievance Committee*, 847 F.2d 57 (2d Cir. 1988), the defendant argues that "[w]here, as here, the alleged misconduct concerns matters that are peripheral to the merits of the case, courts will refuse to use their implied powers to dismiss or default the case." Opposition to Plaintiff's Motion for Sanctions, at 11. These cases stand for the proposition that "dismissal is permissible only when the deception relates to matters in controversy in the action, and even then is so harsh a remedy that it should be imposed only in the most extreme cases." *Bower, supra,* at 112. There is, of course, authority for the contrary proposition that "when a plaintiff misrepresents information during discovery, dismissal is not dependent upon whether the information goes to the merits of the case or upon 'the ultimate importance of the false or deceptive information'." *Reed, supra,* at 609.

In view of the sanctity of the oath, the court follows *Reed, supra,* and concludes that imposing a sanction does not depend upon whether a party's lying under oath relates to matters in controversy. Even if it could be said that Dr. Painter's misconduct is tangential to the underlying issues of causation and standard of care, the defendant's credibility, or lack thereof, is central to the case. The plaintiff alleges that the defendant failed to perform a femoral

angiogram, which would have detected the presence of plaque in the artery, a contraindication for the use of the vascular closure device. Dr. Painter maintains that he did a femoral angiogram, but "[t]here is no picture of it." (Painter Dep., at 44.) Thus, whether the defendant is credible is at the heart of the case.

The court is of the opinion that Dr. Painter has intentionally engaged in a pattern of deceptive and abusive conduct designed to undermine the court's ability impartially to adjudicate the case by (1) testifying falsely in his deposition; (2) giving a false interrogatory answer; (3) obtaining access to the plaintiff's confidential medical records, in violation of HIPAA; (4) using the information so obtained improperly to influence the plaintiff's treating physician; (5) suppressing a document that the plaintiff intended to make an exhibit to the defendant's deposition; and (6) influencing a witness to testify falsely. As the Supreme Court of Virginia stated many years ago, "falsehood is a badge of fraud, and a case which is sought to be supported by means of deception may *prima facie*, until the contrary be shown, be taken to be a bad and dishonest case. . . ." *Neece v. Neece*, 104 Va. 343, 348, 51 S.E. 739, 740 (1905). The court finds by clear and convincing evidence that Dr. Painter has committed fraud on the court.

The court cannot tolerate such conduct, and a sanction is unquestionably warranted. The dismissal of a plaintiff's case is a harsh sanction, but many courts have imposed such a sanction for conduct far less contumacious than that of the defendant in the case at bar. If, in the exercise of the court's inherent power, such a sanction is available to punish a plaintiff, it must also be available to punish a defendant whose deceptive and abusive conduct is no less deserving of condemnation. The court grants the motion for sanctions, strikes the defendant's answer, and grants the plaintiff summary judgment on the issue of liability. The case will proceed to trial on the issue of damages only.