COURT OF APPEALS OF VIRGINIA

Present: Judges Humphreys, Huff and Lorish
Argued at Norfolk, Virginia

UNPUBLISHED

DEMARCUS MALIK MACKEY

MEMORANDUM OPINION* BY
v.     Record No. 1091-22-1         JUDGE GLEN A. HUFF
                                    JUNE 6, 2023

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
David W. Lannetti, Judge

Thomas H. Sheppard, II (Sheppard & O'Brien, P.C., on brief), for
appellant.

Lucille M. Wall, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Demarcus Malik Mackey ("appellant") appeals his convictions from the Norfolk Circuit

Court (the "trial court") for the second-degree murder of Stefon Grimes and the abduction of

Alexandra Mitchell, as well as for burglary and three corresponding counts of use of a firearm in the

commission of a felony. He asserts the trial court erred in sentencing him because it considered

conduct underlying his charge of malicious wounding—of which he was acquitted by the jury. He

also contends the evidence did not establish he perpetrated the crimes for which he was convicted.

Finally, he assigns error to the trial court's refusal of a curative instruction in response to a comment

by the Commonwealth in its closing argument that referred to his character. This Court disagrees

and affirms.

---

* This opinion is not designated for publication. *See* Code § 17.1-413.

BACKGROUND[1]

After a trip to the grocery store, Stefon Grimes and his girlfriend Alexandra Mitchell returned to Grimes's home around 6:00 p.m. on June 25, 2019. Grimes realized he forgot something and left to return to the store.

Soon after, Mitchell took their puppy outside on the front lawn. It was still daylight outside. From the porch, Mitchell noticed "a guy on the phone" about thirty feet away. The two "locked eyes," and the man walked toward her and told her he was "looking for Stefon."

"Stefon is not here," replied Mitchell, as she began to walk away back toward the front door. The man followed her, walking "fast," and retorted, "Well, he told me to wait inside for him." Mitchell told the man, "No," when suddenly two other men she had not yet noticed came around the side of the home, and the three men together "bum rushed [Mitchell] into the house." The three intruders all pulled out guns and pushed her into the bathroom near the front door.

Mitchell testified at trial that she got a good look at the men. She described all three intruders as Black men with uncovered faces. The man she had seen on the phone was "dark-skinned" and "maybe about five something, maybe taller than" herself, and he wore a white "shirt with green stripes." One of the other men wore a dark or black shirt.

Once the men pushed her into the bathroom, Mitchell got down and looked away from them out of fear. "Where's Stefon?" they asked, "Where's the money?" Mitchell pleaded that she did not know where Stefon was and insisted there was no money.

One of the men began ransacking the living room as the other two stood over Mitchell in the bathroom. Grimes and Mitchell's second dog made a noise upstairs, alarming the intruders; once

---

[1] This Court must view "the evidence in the light most favorable to the Commonwealth," which includes "discard[ing] all evidence of the accused that conflicts with that of the Commonwealth and regard[ing] as true all credible evidence favorable to the Commonwealth and all fair inferences reasonably" drawn from that evidence. *Kelley v. Commonwealth*, 69 Va. App. 617, 624 (2019) (quoting *Parham v. Commonwealth*, 64 Va. App. 560, 565 (2015)).

Mitchell explained there was a dog upstairs, one of the men instructed the man searching the living room to go upstairs. The other two intruders then moved Mitchell from the bathroom to the living room couch.

The two men stood guard in the living room as the third kept searching the upstairs. As Mitchell sat on the couch, she could "see the sunlight from the front door opening." Grimes had returned home. The two men in the living room took cover and raised their guns.

The ensuing attack played out "fast." As Grimes came through the front door, the two men opened fire on him. Grimes was hit by the gunfire and began stumbling forward toward the dining area, located at the foot of the stairs and next to the living room. In the chaos, Mitchell got up and ran toward Grimes. The third man descended to the stairwell landing and also began firing toward Grimes and Mitchell. As they kept firing, the two men from the living room ran past Grimes and out the front door, and the third man followed. One of the men stopped near the front door on his way out and shot back toward Grimes and Mitchell.

After the men left, Grimes lay on his back on the dining room floor, at the foot of the stairs. He was shot six times—twice in the head. He died from his injuries before paramedics arrived. First responders found Mitchell sitting next to Grimes's body. She, too, was shot multiple times: once in each arm and once in each leg. She was transported to the hospital and survived her wounds.

Three of Grimes's neighbors witnessed the men in the neighborhood the evening of the murder. The first two neighbors, Sharon Williams and her husband Kenneth Turner, were standing on their front porch when they saw a car driving past their home and down the street toward their cul-de-sac. The car reached the cul-de-sac, turned around, and left. A few minutes later, the car returned and parked in the cul-de-sac. Eventually, three Black men got out of the car and began walking up the street. A fourth man, the driver, stayed in the car.

According to Turner, the men appeared to be in their mid-20s. At trial, Williams identified appellant as one of the men and testified that he wore a white shirt and blue jeans on the day of the murder. She saw that another wore "blue jeans and a darker blue shirt." Turner also noted that one of the men wore a white shirt and blue jeans while another wore a black shirt. Williams and Turner detailed the actions of the three men leading up to Mitchell being pushed inside the house.

Williams and Turner observed Grimes arrive home and then heard multiple gunshots before the three men—all holding guns—fled from Grimes's house and down the street toward the car that had dropped them off.

The third neighbor-witness was Lashonda Branch. She stepped outside her home that evening and saw two Black men "walk across [her] sidewalk in front of [her] door." One of the men leaned against her car, which was parked in front of her home. A third Black man stood at "the end of [her] driveway on the opposite side of [her] home." She noted that one of the men "had a distinctive walk"—an "excessive limp"—and he tried to balance himself by leaning against her car. Branch did not see the men enter or exit the Grimes home, and she never heard gunshots.

Investigators showed Mitchell four photographic lineups three weeks after the murder. While viewing the six pictures of one of those lineups, Mitchell identified appellant. She confirmed her identification on a second review of the lineup. On a lineup identification statement she noted that she recognized the man in the picture from "his face, eyes, mouth, [and] nose." She added, "He was the second person to walk in the house that came from the side. He was one of the ones that put me in the bathroom and held a gun."

When investigators interviewed appellant, he denied any involvement with Grimes's murder. He did, however, admit that about a month and a half before the murder he had been

"scoping out" a nearby location for a possible robbery.  At trial, appellant did not object to video of, or testimony about, appellant's robbery-planning statements.[2]

One of the investigators interviewing appellant, Detective Matthew Walsh, testified at trial. He noticed during the interview that appellant walked with a limp and, at one point, had to "brace himself . . . against the wall."

At trial, Mitchell, Williams, Turner, and Branch all testified.  Each identified appellant as one of the men from that day.  Mitchell specifically identified him as one of the two men in the living room during the shooting.  And Branch identified appellant as the man with the limp she saw outside of her home that evening—an identification she first made at a preliminary hearing and reiterated in her trial testimony.  She also testified that she "made eye contact" with appellant as he walked across her lawn and that she remembered him most of the three men.

The parties agreed on jury instructions.  One instruction, Instruction 5B—a facsimile of Criminal Model Jury Instruction No. 2.200—told the jury: "You may consider the character of the defendant when proven by the evidence, whether good or bad, along with the other facts and circumstances in the case in determining his guilt or innocence."

The trial court instructed the jury and proceeded to closing arguments.  During its closing argument, the Commonwealth made note of Instruction 5B, commenting, "So what does that mean for right now?  We know that the character of [appellant] is he's the kind of guy to do robberies.  In fact, he was literally planning on doing a robbery in this particular case."

At the end of the Commonwealth's closing argument, and outside the presence of the jury, appellant asked for a curative instruction to address the Commonwealth's references to his character in its closing argument.  He argued the statements were improper because "[t]here was no character

---

[2] However, the parties agreed to, and the trial court granted, a limiting instruction telling the jury "third-party statements repeated by [appellant] during his interview with Norfolk police investigators . . . are provided for context only and shall not be considered by you for their truth."

evidence introduced at trial," and his robbery-planning statements could not be considered such. Specifically, he proposed an instruction "that would have said disregard [the Commonwealth's] reference to the specific jury instruction . . . with respect to [appellant's] statements to law enforcement." The court rejected the proffered instruction as "inappropriate." Appellant followed up with a motion for a mistrial, citing the Commonwealth's character comments, which the trial court also denied.

The jury convicted appellant of second-degree murder, abduction, and burglary, along with three corresponding counts of use of a firearm in the commission of a felony.[3] It acquitted him, however, of maliciously wounding Mitchell and an accompanying use-of-a-firearm charge.

For appellant's sentencing, Mitchell prepared a written victim impact statement, which was shared with the defense. In the statement, which she planned to read at sentencing, she described the four gunshot wounds she sustained the day of the murder, as well as the physical, mental, and emotional toll she suffered because of the shooting. Appellant objected to Mitchell's testimony, asking the trial court to exclude any mention of her injuries because he was acquitted of maliciously wounding her. Appellant's counsel argued "the [c]ourt should not consider evidence of that malicious wounding if he's been acquitted of it" because doing so "would be a violation of his double jeopardy rights under the Fifth Amendment." The trial court denied the objection, and Mitchell recited her statement during the hearing.[4]

---

[3] Appellant's co-defendant was acquitted of all charges.

[4] The written statement was never admitted into evidence, but it tracked Mitchell's actual testimony. She testified, in part:

> I was also a victim of the defendant. I was shot four times and bled from eight holes. I didn't lose my life, but he might as well have taken it too. . . . My physical wounds, however, can't compete with the mental and emotional damage I suffered from the defendant pushing me in the house, shooting me, and killing the love of my life in front of me.

Ultimately, the trial court sentenced appellant to a total sentence of 83 years, with 43 years suspended.[5] This appeal followed.

ANALYSIS

I. Consideration of Mitchell's Testimony at Sentencing

Appellant was acquitted of the charge of maliciously wounding Mitchell. He thus claims the trial court could not consider Mitchell's testimony about her shooting-related injuries at sentencing because to do so would punish him for acquitted conduct, violating the Fifth Amendment's Double Jeopardy Clause, the Sixth Amendment, and the Fourteenth Amendment's Due Process Clause. This Court disagrees.

First, to the extent appellant argues the use of this evidence at his sentencing violated the Sixth and Fourteenth Amendments, those arguments are waived. In his motion at sentencing, he cited only the Double Jeopardy Clause to justify excluding the evidence.[6] He cannot expand that argument on appeal. *Edwards v. Commonwealth*, 41 Va. App. 752, 760 (2003) (en banc) ("Making one specific argument does not preserve a separate legal point on the same issue for review."). And as for appellant's properly preserved double-jeopardy challenge, United States Supreme Court precedent forecloses that argument. In *United States v. Watts*, 519 U.S. 148 (1997) (per curiam), the Supreme Court rejected the appeals court's conclusion that the trial court could not consider conduct underlying an acquitted charge during sentencing. A contrary conclusion, the Court wrote,

---

[5] Appellant received 40 years for second-degree murder (23 years suspended), 10 years for abduction (7 years suspended), 20 years for burglary (13 years suspended), 3 years for use of a firearm in the commission of the murder, and 5 years for the final two use-of-a-firearm convictions.

[6] At oral argument, appellant's counsel (who also represented him at trial) asserted that he cited "due process" concerns before the trial court but was cut off, so the court reporter mistakenly did not transcribe those words. But without more than his assertion, this Court must presume the transcript is correct. *Smith v. Commonwealth*, 59 Va. App. 710, 721 (2012) ("A transcript of the evidence and incidents of trial, certified by the trial judge, is presumed to be correct and, *in the absence of proof to the contrary*, is binding upon an appellate court.").

would "conflict[] with the implications of the [Federal Sentencing] Guidelines [and] . . . be based on erroneous views of our double jeopardy jurisprudence." *Id.* at 154. In that context, the Court held "that a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." *Id.* at 157.

*Watts* therefore rejected the same argument appellant brings on appeal—that the Double Jeopardy Clause prevented the trial court from considering facts underlying the acquitted malicious wounding charge. The record bears out that the Commonwealth's evidence established appellant was a perpetrator in the shooting inside the Grimes home, and Mitchell was shot multiple times during that shooting. Accordingly, this Court finds no error in the trial court's consideration of that evidence.

## II. The Sufficiency of the Evidence

Appellant next asserts that the evidence at trial was insufficient to establish his identity as one of the perpetrators of the crimes. Specifically, he rejects the witness testimony as inherently incredible due to "contradictions and inconsistencies."

Viewed "in the 'light most favorable' to the Commonwealth," the witness testimony by Mitchell, Turner, Williams, and Branch was sufficient for a rational factfinder to conclude beyond a reasonable doubt that appellant perpetrated the crimes for which he was charged. *See Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Mitchell saw all three men when they barged into Grimes's home and forced her into the bathroom at gunpoint. Although she admitted that she tried to refrain from making eye contact with the intruders, she testified she got a good look at them and repeatedly identified appellant at trial as one of the men who stood near her during the home invasion. She also identified appellant in a photo lineup—only three weeks after the murder.

Turner and Williams both testified to substantively the same facts: they identified appellant as one of the three men who got out of a car, approached Grimes's home, forced their way inside, and later fled from the home back to the car after the shooting. Branch also saw three men walking in front of her house that day; one of the men—whom she identified as appellant—walked with such a pronounced limp that he had to steady himself against her car. Detective Walsh's testimony corroborated that identification as he, too, noticed that appellant walked with a limp and had to steady himself when he attended the interview with investigators.

Appellant cites various alleged contradictions in the witness testimony that he says render the identifications inherently incredible: Williams testified appellant was the one to approach Mitchell outside of the home, while Mitchell said it was appellant's co-defendant. Branch saw appellant walk with a limp, but none of the other witnesses noticed a limp. And Williams and Branch failed to identify appellant in a photo lineup a few weeks after the incident, while Turner testified at the preliminary hearing that there were two, rather than three, men present that day.

But "[a] legal determination that a witness is inherently incredible is very different from the mere identification of inconsistencies in a witness' testimony or statements." *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019). "Testimony may be contradictory or contain inconsistencies without rising to the level of being inherently incredible as a matter of law." *Id.* The role of weighing those contradictions to determine the credibility of testimony belongs to the jury. *Id.* Ruling testimony inherently incredible as a matter of law is an extreme step that usurps the factfinder's role, so a court may take that step only on the exceedingly rare occasion when testimony is "so manifestly false that reasonable men ought not believe it," or when the testimony is "shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ." *Id.* (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)).

Appellant has not made such a showing here. In total, four witnesses all identified appellant as one of the perpetrators. One of those eyewitnesses noted his distinctive limp—emphasized by his need to stabilize himself for balance—which matched the interviewing detective's description of appellant. And Mitchell, who had the most opportunity to see the perpetrators that day, never wavered in her identification of appellant. The jury considered all the witness testimony, along with any of its contradictions, and concluded beyond a reasonable doubt that appellant was indeed one of the men involved in the murder. This Court cannot second-guess that determination.

### III. The Refused Jury Instruction[7]

Appellant's final assignment of error takes issue with the trial court's refusal of his proffered curative instruction to the jury. That instruction would have told the jury to disregard the Commonwealth's comment during its closing argument that the jury should consider as character evidence, pursuant to Instruction 5B, appellant's statements to police that he had previously planned a robbery in Grimes's neighborhood. Instruction 5B—agreed to by the parties before closing arguments—allowed the jury to "consider the character of the defendant when proven by the evidence."

Generally, a "prosecutor cannot introduce evidence of the bad character of the accused unless and until the defendant puts his character in issue." *Winston v. Commonwealth*, 12 Va. App. 363, 404 (1991). Appellant emphasizes that he never did so during the trial.

---

[7] Although the Commonwealth contends appellant failed to preserve this argument for appeal because he did not immediately object during the Commonwealth's closing argument, this Court disagrees.

When objecting to closing arguments, a party must "timely move[] for a cautionary instruction or for a mistrial," *Cheng v. Commonwealth*, 240 Va. 26, 38 (1990), so as to "afford[] the trial court the opportunity to provide cautionary instructions when appropriate to correct the alleged error," *Mack v. Commonwealth*, 20 Va. App. 5, 8 (1995). Although appellant did not object immediately, he did request a cautionary instruction and moved for a mistrial at the end of the argument, giving the trial court an "opportunity to provide [the requested instruction] to correct the alleged error." *See id.*

Nonetheless, appellant agreed to Instruction 5B. And "instructions given without objection become the law of the case and thereby bind the parties in the trial court and this Court on review." *Smith v. Commonwealth*, 296 Va. 450, 461 (2018) (quoting *Wintergreen Partners, Inc. v. McGuireWoods, LLP*, 280 Va. 374, 379 (2010)).[8] Even if appellant never opened the door to evidence of his character while making his case, he effectively did so by agreeing to Instruction 5B. Nor did he object to the robbery-planning statements when they were admitted during trial. Accordingly, the jury could properly consider those statements as evidence rebutting his good character. *Cf. Pughsley v. Commonwealth*, 33 Va. App. 640, 647 (2000) ("[W]here a defendant puts on evidence that he has been of good character . . . , the Commonwealth may, subject to the trial court's sound discretion, introduce evidence of specific acts in the defendant's 'history and background' which rebuts the defendant's contention or proves that the defendant has a history or background of criminal or bad acts or is not of good character."). The trial court therefore did not err in denying appellant's request for a curative instruction to the contrary.

---

[8] Instruction 5B is identical to Model Jury Instruction 2.200. The model instruction's advisory notes warn, "This instruction should not be given <u>unless</u> the defendant has offered character evidence." Model Jury Instrs.—Crim. No. 2.200 sources & authority (first citing *Robinson v. Commonwealth*, 118 Va. 785, 790 (1916); and then citing *Poole v. Commonwealth*, 211 Va. 262, 265 (1970)); *accord* Va. R. Evid. 2:404(a) ("Evidence of a person's character or character trait is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except . . . [for, among other exceptions,] [e]vidence of a pertinent character trait of the accused offered by the accused, or by the prosecution to rebut the same.").

However, regardless of whether appellant put his character at issue, "an agreed jury instruction becomes the law of the case, even if it imposes 'an inappropriate standard.'" *Smith*, 296 Va. at 462 (quoting *Owens-Corning Fiberglas Corp. v. Watson*, 243 Va. 128, 136 (1992)). And here, appellant never objected to Instruction 5B.

CONCLUSION

The trial court did not err in admitting Mitchell's testimony at sentencing, finding the evidence sufficient to identify appellant as a perpetrator of the crimes, or rejecting appellant's proffered curative instruction. This Court thus affirms appellant's convictions.

*Affirmed.*

Lorish, J., concurring in the opinion.

A jury acquitted Mackey of maliciously wounding Mitchell. Yet the trial judge, explaining why it sentenced Mackey above the guideline recommendation, noted that the "[second] person [was] shot multiple times." Whether a judge may increase a defendant's sentence based on acquitted conduct is an issue of first impression in Virginia. That is no surprise—from 1796 to 2021, a criminal defendant convicted by a jury in this Commonwealth was sentenced by that jury.[9] Recent amendments to Code § 19.2-295 now allow a defendant to exercise the constitutional right to trial by jury and then be sentenced by a judge unless the defendant instead elects to be sentenced by the jury. 2020 Va. Acts Spec. Sess. I ch. 43. This sea change in sentencing followed decades of sentencing data showing that jury sentences in Virginia were significantly harsher than sentences by judges.[10] This change also creates the conditions for the scenario, presented here, where a sentencing judge considers conduct for which the jury acquitted the defendant.

While I agree with the majority that the double jeopardy challenge raised by Mackey below lacks merit under *United States v. Watts*, 519 U.S. 148 (1997), given the specific facts linking the acquitted conduct to the offenses of conviction, I would not find that *Watts* forecloses

---

[9] *See* Jenia Iontcheva, *Jury Sentencing as Democratic Practice*, 89 Va. L. Rev. 311, 317 (2003) (noting Virginia was "the first state to formally adopt jury sentencing for all criminal offenses" in 1796); Act of Dec. 22, 1796, § 15, 1796 Va. Acts ch. 2, at 5.

[10] In 2020, the year before the statute was amended, active sentences handed down by judges (following a plea agreement or bench trial) exceeded the guideline recommendation for incarceration in only 7.2% of cases. Va. Crim. Sent'g Comm'n, Annual Report 27-29 (2020), www.vcsc.virginia.gov/2020VCSCAnnualReport.pdf. But in 40.1% of cases where a defendant was sentenced by a jury, the jury sentence was higher than the guideline recommendation (a recommendation juries are precluded from receiving by Code § 19.2-298.01(A)). *Id.* One factor that may contribute to the disparity is that a "court may suspend [part of a] sentence or place the accused on probation," including when a statute imposes a minimum sentence, but "[i]n no case may the jury recommend that a portion of the sentence be suspended." Ronald J. Bacigal & Corinna Barrett Lain, *Virginia Practice Series Criminal Procedure* § 19:2 (2022-2023 ed.).

a future double jeopardy challenge when such a link is lacking.  I write separately to situate the narrow holding in *Watts* (a federal case about the federal sentencing guidelines) within Virginia's distinct sentencing framework, and to set out the important questions not answered here—whether a judge may use acquitted conduct at sentencing under the Sixth Amendment's right to trial by jury or the Fourteenth Amendment's Due Process Clause.

      I.  Under *Watts*, a sentencing judge relying on acquitted conduct does not violate the Double Jeopardy Clause so long as the acquitted conduct is sufficiently proven as related to the offense of conviction.

Under *Watts*, "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as the conduct has been proved by a preponderance of the evidence."  519 U.S. at 157.  Yet as the Supreme Court later clarified, *Watts* presented a "very narrow question regarding the interaction of the [Federal Sentencing] Guidelines with the Double Jeopardy Clause" and did not consider whether a judge's "sentencing enhancement had exceeded the sentence authorized by the jury verdict in violation of the Sixth Amendment."  *United States v. Booker*, 543 U.S. 220, 240, 240 n.4 (2005).  Nor did it consider the implications of acquitted-conduct sentencing for the Due Process Clause.  *See, e.g.*, *People v. Beck*, 939 N.W.2d 213, 224 (Mich. 2019) (finding *Watts* "unhelpful in resolving whether the use of acquitted conduct at sentencing violates due process" because "*Watts* addressed only a double-jeopardy challenge").

The Fifth Amendment's Double Jeopardy Clause states: "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb."  U.S. Const. amend. V.  Analyzing this clause under the federal sentencing framework, *Watts* began with the premise that "sentencing courts have broad discretion to consider various kinds of information" under 18 U.S.C. § 3661.  519 U.S. at 151.  Then the Supreme Court turned to "relevant conduct," a

- 14 -

foundational concept under the federal sentencing guidelines, which ensures that conduct a sentencing judge considers is sufficiently related to the offense of conviction. *Id.* at 152-56.

The federal sentencing guidelines define "relevant conduct" to an underlying offense of conviction as including "all acts and omissions committed" by the defendant "that occurred during the commission of the offense of conviction." U.S.S.G. § 1B1.3(a)(1)(A). In the case of "jointly undertaken criminal activity," the net is even broader; "relevant conduct" may include "acts and omissions of others" that were within the "scope of the jointly undertaken criminal activity," done "in furtherance" of that activity, and "reasonably foreseeable." *Id.* § 1B1.3(a)(1)(B). In *Watts*, a different guideline subsection for certain offenses also required the sentencing court to consider "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." *Watts*, 519 U.S. at 153 (alteration in original) (quoting U.S.S.G. § 1B1.3(a)(2)).

Taken together, these federal guideline requirements ensure that "sentencing enhancements do not punish a defendant for crimes of which he was not convicted, but rather increase his sentence because of the manner in which he committed the crime of conviction." *Id.* at 154. Ensuring particular acts or omissions are "relevant conduct" under the guidelines promises that a defendant is "punished only for the fact that the *present* offense was carried out in a manner that warrants increased punishment." *Id.* at 155 (quoting *Witte v. United States*, 515 U.S. 389, 403 (1995)). This focus on conduct vindicates the core concern of the Double Jeopardy Clause which "protects individuals from being twice put in jeopardy 'for the same *offence*,' not for the same *conduct* or *actions*." *United States v. Gamble*, 139 S. Ct. 1960, 1965 (2019) (quoting *Grady v. Corbin*, 495 U.S. 508, 529 (1990) (Scalia, J., dissenting)).

Further assurance that the acquitted conduct is relevant to the offense(s) of conviction comes from the "preponderance of the evidence standard"[11] that federal courts must apply in resolving any dispute over the application of a sentencing factor in the guidelines. *See, e.g.*, U.S.S.G. § 6A1.3, cmt. ("[U]se of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case."); *United States v. Urrego-Linares*, 879 F.2d 1234 (4th Cir. 1989) (applying preponderance of the evidence standard). If a federal defendant objects to a sentencing enhancement based on acquitted conduct, the prosecution bears the burden of proving, by the preponderance of the evidence, that the enhancement is both factually accurate and that it is "relevant conduct" to the offense(s) of conviction. *See, e.g.*, *United States v. Mitchell*, 825 F.3d 422, 425 (8th Cir. 2016).

Finally, at the time *Watts* was decided, the federal sentencing guidelines were mandatory; a district court had to issue a sentence within the guideline range. Even after the Supreme Court later declared mandatory guidelines unconstitutional, rendering the federal sentencing guidelines advisory only,[12] a federal court's failure to properly calculate the guidelines or adequately explain its sentence is procedural error subject to possible reversal. *Gall v. United States*, 552 U.S. 38, 51 (2007); *United States v. Carter*, 564 F.3d 325, 328 (4th Cir. 2009) (reversing sentence that was not procedurally reasonable). These requirements, coupled with the promise of appellate review, help ensure that guideline determinations are accurate.

---

[11] Black's Law Dictionary defines "preponderance of the evidence" as the "greater weight of the evidence," "evidence that has the most convincing force," and "superior evidentiary weight that, though not sufficient to free the mind wholly from all reasonable doubt, is still sufficient to incline a fair and impartial mind to one side of the issue rather than the other." *Preponderance of the Evidence*, *Black's Law Dictionary* (11th ed. 2019). "Preponderance of the evidence" is a lower standard than the "beyond a reasonable doubt" standard employed by the jury.

[12] *See Booker*, 543 U.S. 220.

The Supreme Court's pronouncement that a sentencing court's reliance on "acquitted conduct" found by the "preponderance of the evidence" standard did not violate the Double Jeopardy Clause hinged on the combination of all these facets of federal sentencing, which collectively ensure that a defendant is "punished only for the fact that the *present* offense was carried out in a manner that warrants increased punishment." *Watts*, 519 U.S. at 155 (quoting *Witte*, 515 U.S. at 403).

But the Virginia sentencing guidelines lack a similar definition of "relevant conduct." Whether acquitted conduct is used to enhance a guideline range, or as a reason to exceed the range produced by guidelines, there is no standard of proof by which a court must resolve the matter. The guidelines simply instruct judges to apply the rules in the manual. Imagine the case of a drug offense, where the Virginia guidelines provide for an enhancement if the defendant possessed a firearm, and a defendant was acquitted by a jury of the separate offense of possessing a firearm while in the possession of controlled substances, Code § 18.2-308.4. Under the guidelines and our current caselaw (or lack thereof), a judge could find the enhancement is warranted based on any standard of proof.

There is then, by statute, no appellate review of a court's failure to follow any or all of the provisions of the sentencing guidelines. Code § 19.2-298.01(F). If a judge merely suspected the acquitted defendant possessed a firearm, and sentenced him in accordance with a guideline recommendation that was elevated based on that firearm, no appellate review would be available. Because sentencing in Virginia lacks the procedural safeguards from which the Supreme Court concluded a judge applying the federal "preponderance of the evidence" standard to "relevant conduct" did not violate the Double Jeopardy Clause, I would not find that *Watts* rejects every double jeopardy challenge to sentencing based on acquitted conduct in Virginia.

The record here, however, provides a sufficient factual basis for this Court to conclude that Mackey was punished "for the fact that the *present* offense was carried out in a manner that warrants increased punishment," avoiding any double jeopardy concern. *Watts*, 519 U.S. at 155 (quoting *Witte*, 515 U.S. at 403). The jury convicted Mackey of participating in the burglary of the home of Mitchell and Grimes, murdering Grimes, and abducting Mitchell. The only evidence presented at trial was that Mitchell was shot during the burglary and abduction. Mitchell's injuries would plainly qualify as conduct relevant to Mackey's offenses of conviction. While it is possible the jury acquitted Mackey for several reasons, including lacking the requisite intent, there is no question that Mitchell sustained the injuries during the other offenses the jury found Mackey responsible for. As such, there is no double jeopardy violation here.

## II. The use of acquitted conduct at sentencing may violate the Sixth Amendment right to trial by jury as well as the Fourteenth Amendment Due Process Clause.

For the first time on brief, Mackey argued the court's use of acquitted conduct at sentencing violated the Sixth Amendment jury-trial right as well as the Due Process Clause of the Fourteenth Amendment. I agree with the majority that Mackey failed to preserve these issues for appeal. *See, e.g.*, *West v. Commonwealth*, 43 Va. App. 327, 339 (2004) ("Error alone, even a violation of constitutional principles, is not sufficient to warrant application of the ends of justice exception to Rule 5A:18."). In the appropriate future case, however, our Court will need to resolve these well-founded concerns.

The Sixth Amendment's jury-trial right is one of the most "fundamental reservation[s] of power in our constitutional structure." *Blakely v. Washington*, 542 U.S. 296, 306 (2004). It not only gives citizens a voice in the courtroom, but also guarantees them "control in the judiciary." *Id.* Our entire polity has a strong interest in ensuring that its verdicts get deference. That is most true in the context of a jury *acquittal*, which the Constitution regards as inviolate. *See Burks v. United States*, 437 U.S. 1, 16 (1978) ("[W]e necessarily afford absolute finality to a jury's

- 18 -

*verdict* of acquittal—no matter how erroneous its decision."); *see also e.g.*, *Yeager v. United States*, 557 U.S. 110, 122-23 (2009) (commending the "unassailable" finality of jury acquittal even if based on an "egregiously erroneous foundation").

When judges sentence on the basis of acquitted conduct, they undermine the community's duty and prerogative to oversee the administration of criminal justice. "Just as suffrage ensures the people's ultimate control in the legislative and executive branches," the "jury trial is meant to ensure [the people's] control in the judiciary." *Blakely*, 542 U.S. at 306.

Benefits from the Sixth Amendment right to trial by jury extend beyond the community, reaching the individual criminal defendant and providing an "inestimable safeguard" to protect a defendant "against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge." *Duncan v. Louisiana*, 391 U.S. 145, 156 (1968). Jury trials are "fundamental to the American scheme of justice." *Ramos v. Louisiana*, 140 S. Ct. 1390, 1397 (2020) (quoting *Duncan*, 391 U.S. at 148-50); *see also Batson v. Kentucky*, 476 U.S. 79, 86 (1986) (the jury-trial right "safeguard[s] a person accused of crime against the arbitrary exercise of power by prosecutor or judge"); *Apprendi v. New Jersey*, 530 U.S. 466, 477 (2000) (the jury "guard[s] against a spirit of oppression and tyranny on the part of rulers," and acts "as the great bulwark of [our] civil and political liberties" (second alteration in original)); *Alleyne v. United States*, 570 U.S. 99, 114 (2013) (noting "the historic role of the jury as an intermediary between the State and criminal defendants").

Allowing a judge to sentence a defendant based on acquitted conduct is simply at odds with the "jury's historic role as bulwark between the State and the accused." *S. Union Co. v. United States*, 567 U.S. 343, 350 (2012) (quoting *Oregon v. Ice*, 555 U.S. 160, 168 (2009)). Instead, acquitted-conduct sentencing gives the government a "second bite at the apple," during which "the Government almost always wins by needing only to prove its (lost) case to a judge"

by a standard lower than "beyond a reasonable doubt." *United States v. Canania*, 532 F.3d 764, 776 (8th Cir. 2008) (Bright, J., concurring).

To that point, the Fourteenth Amendment right to due process "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). The beyond-a-reasonable-doubt standard "provides concrete substance for the presumption of innocence." *Id.* at 363. Considering acquitted conduct at sentencing may offend the Due Process Clause by eliminating the core protection of proof beyond a reasonable doubt, undermining the presumption of innocence. *See, e.g.*, *Beck*, 939 N.W.2d at 225 ("[C]onduct that is protected by the presumption of innocence may not be evaluated using the preponderance-of-the-evidence standard without violating due process."); *State v. Marley*, 364 S.E.2d 133, 139 (N.C. 1988) ("[D]ue process and fundamental fairness precluded the trial court from aggravating defendant's second degree murder sentence with the single element— premeditation and deliberation—which, in this case, distinguished first degree murder after the jury had acquitted defendant of first degree murder."); *State v. Cote*, 530 A.2d 775, 785 (N.H. 1987) ("[T]he presumption of innocence is . . . ensconced in our due process . . . [and] [t]his benefit is denied when a sentencing court may have used charges that have resulted in acquittals to punish the defendant.").

A court's reliance on acquitted conduct further implicates due process concerns by increasing the risk of inaccurate sentencing. The Supreme Court has cautioned that even reliance on facts from a prior offense a defendant was *convicted* of may raise concerns about "unfairness" and lead to "error." *Mathis* v. *United States*, 579 U.S. 500, 512 (2016). Courts who rely on facts underlying a jury *acquittal* risk even less accurate sentences.

CONCLUSION

Now that judges in Virginia may sentence a defendant after a jury trial, the question of whether judges may constitutionally use acquitted conduct in sentencing must be resolved in an appropriate case. In the interim, I join with the many other judges in federal and state courts "who in dissenting and concurring opinions, have questioned the fairness and constitutionality of allowing courts to factor acquitted conduct into sentencing calculations." *United States v. McClinton*, 23 F.4th 732, 735 (7th Cir. 2022).